[Cite as *State v. Young*, 2017-Ohio-1400.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

v.

ROY R. YOUNG, JR.

    Appellant

C.A. No.     15CA010803

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    12CR086257

DECISION AND JOURNAL ENTRY

Dated: April 17, 2017

CARR, Presiding Judge.

{¶1}    Defendant-Appellant, Roy Young, Jr., appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2}    On the evening of July 10, 2012, Young's then 15-year-old step-daughter, B.B., told her mother that Young had been raping her since the age of five. B.B.'s mother initially kept B.B.'s accusations to herself while B.B. went to stay with a friend and her father. A few days later, however, Young became intoxicated, struck B.B.'s mother, and threatened to kill her. The police were called and, when they arrived, B.B.'s mother told them that Young had been raping her daughter. The police then arrested Young for domestic violence and began investigating the sexual abuse allegations.

{¶3}    A grand jury ultimately indicted Young on three counts of rape, three counts of sexual battery, and three counts of gross sexual imposition. The charges pertained to three

distinct time periods, with a single count of each crime occurring between: (1) October 27, 2001, and October 25, 2006; (2) October 26, 2006, and October 25, 2009; and (3) October 26, 2009, and July 11, 2012. The three charges related to the earliest time period were all originally alleged to have occurred in Lorain County, but the State later successfully moved to amend the indictment to provide that those charges occurred in Lorain and/or Huron County, Ohio. Meanwhile, the six charges for the two later time periods were all alleged to have occurred strictly in Lorain County. Following discovery, a jury trial was held.

{¶4} The jury found Young guilty on all nine counts and further found, with respect to the first rape charge, that B.B. was under the age of ten when the offense occurred. The trial court sentenced Young to life in prison with the possibility of parole after 13 years and classified him as a Tier III sexual offender/child victim offender.

{¶5} Young now appeals from his convictions and raises five assignments of error for our review. For ease of analysis, we rearrange several of the assignments of error.

II.

## ASSIGNMENT OF ERROR II

THE INDICTMENT WAS INSUFFICIENT AND IN CONTRAVENTION OF DUE PROCESS BY PLACING OVERLY BROAD TIME FRAMES IN ALL COUNTS OF THE INDICTMENT AND LACK OF AN ESSENTIAL ELEMENT IN COUNTS ONE, FOUR AND SEVEN[.]

{¶6} In his second assignment of error, Young argues that his indictment failed to afford him adequate notice of the charges against him because it only described his offenses in terms of broad timeframes and a single venue rather than multiple venues. We separately address each issue.

**Broad Timeframes**

{¶7} "[O]bjections based on defects in the indictment must be made prior to trial." *State v. Smith*, 9th Dist. Summit No. 27877, 2016-Ohio-7278, ¶ 6. "When a defendant fails to preserve objection to a purported defect in the indictment, he forfeits all argument but that of plain error." *State v. Horton*, 9th Dist. Summit No. 26407, 2013-Ohio-3902, ¶ 18. Crim.R. 52(B) circumscribes this Court's ability to recognize plain error in three ways. "First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. Third, the error must have affected * * * the outcome of the trial." (Internal citations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). This Court notices plain error only in exceptional circumstances to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶8} "'[T]he purpose of an indictment is to provide the accused with sufficient notice of the offense, including the essential elements of the crime, with which that individual is charged.'" *State v. Campbell*, 9th Dist. Medina No. 13CA0013-M, 2014-Ohio-1329, ¶ 9, quoting *State v. Ebersole*, 9th Dist. Summit No. 19447, 1999 WL 980552, *2 (Oct. 27, 1999). "[P]recise times and dates are not ordinarily essential elements of an offense * * *." *State v. Bennett*, 9th Dist. Lorain No. 10CA009917, 2011-Ohio-6679, ¶ 11, quoting *State v. Ritchie*, 9th Dist. Lorain No. 95CA006211, 1997 WL 164323, *2 (Apr. 2, 1997). "It has been widely held in Ohio that an indictment involving child sexual abuse need not specify exact dates and times of the alleged offenses." *Ritchie* at *2. Those cases often involve "'children of tender years who are simply unable to remember exact dates and times, particularly where the crimes involve a repeated course of conduct over an extended period of time.'" *State v. Just*, 9th Dist. Wayne No.

12CA0002, 2012-Ohio-4094, ¶ 9, quoting *State v. Mundy*, 99 Ohio App.3d 275, 296 (2d Dist.1994). "In such cases, the prosecution must set forth a time frame in the indictment and charge the accused with offenses which reasonably fall within that period." *Ritchie* at *2. "[T]he key issue is whether the defendant has notice of the nature of the offense and has been afforded a reasonable opportunity to make a defense." *State v. Williams*, 9th Dist. Summit No. 25716, 2011-Ohio-6604, ¶ 6.

{¶9} Young was indicted on charges pertaining to three distinct time periods: (1) October 27, 2001, to October 25, 2006; (2) October 26, 2006, to October 25, 2009; and (3) October 26, 2009, to July 11, 2012. For each of the three time periods, Young was indicted on one count of rape, one count of sexual battery, and one count of gross sexual imposition. Young argues that the lengthy timeframes related to each of his counts made his defense "impossible" when coupled with the State's "boilerplate Discovery response [that] did not allow for any particularity in defense * * *." He notes that B.B. ultimately testified to several particular instances of sexual abuse. According to Young, he was unable to prepare an adequate response to those particular allegations based on the information in the indictment.

{¶10} Initially, we note that Young's assignment of error strictly challenges the sufficiency of his indictment. We have held that "[a]n appellant's captioned assignment of error 'provides [us] with a roadmap on appeal and directs [our] analysis.'" *See State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 41, quoting *State v. Marzolf*, 9th Dist. Summit No. 24459, 2009-Ohio-3001, ¶ 16. Thus, any issues regarding discovery or the adequacy of the State's response to Young's request for a bill of particulars are not properly before us. The only issue is whether Young's indictment was sufficient.

{¶11} Young never objected to his indictment prior to trial. Although he sets forth the plain error standard on appeal as well as the standard for structural error, he has not conducted an analysis under either standard. *See* App.R. 16(A)(7). He simply maintains that the broad timeframes in the indictment made it impossible for him to defend against the allegations here with any particularity.

{¶12} The State's theory in this case was that Young repeatedly raped and otherwise sexually assaulted his step-daughter, B.B., when she was between five and fifteen years of age. Because B.B. could not precisely recall the dates of the alleged rapes and assaults, the State selected three time frames for the offenses and charged Young with one count of rape, one count of sexual battery, and one count of gross sexual imposition for each distinct time period. *See Ritchie*, 1997 WL 164323, at *2. In addition to designating a timeframe, each of his counts tracked the language of the various statutory subsections that he allegedly violated. *See Campbell*, 2014-Ohio-1329, at ¶ 9, quoting *Ebersole*, 1999 WL 980552, at *2. Thus, Young was placed on notice that he was being charged with several specific sexual offenses over three distinct time periods relating to his step-daughter, B.B. *See State v. Polansky*, 9th Dist. Medina No. 13CA0012-M, 2014-Ohio-2571, ¶ 6 ("An indictment is sufficient if it identifies all essential elements of the charged offense."). He received additional details regarding the offenses through discovery and, as noted, never challenged the adequacy of the State's response to his discovery requests or to his request for a bill of particulars. *See State v. Covic*, 9th Dist. Medina No. 11CA0055-M, 2012-Ohio-3633, ¶ 28 (precise date of sexual offense not an element of crime, but State must supply additional information, if available, through bill of particulars). Moreover, Young never attempted to assert an alibi defense before or after trial. "'Instead, [he] simply claimed that the incident[s] never happened[.]'" *Id.* at ¶ 31, quoting *State v. Carey*, 2d Dist.

Miami No. 2002-CA-70, 2003-Ohio-2684, ¶ 10. Young has not shown that, had he been provided with more specific dates for the offenses in his indictment, the outcome here would have been different. *See Barnes*, 94 Ohio St.3d at 27; *Long*, 53 Ohio St.2d at paragraph three of the syllabus. Accordingly, we reject his argument regarding the broad timeframes in his indictment.

**Venue**

{¶13} "While venue is not a material element of an offense, the State must prove venue beyond a reasonable doubt unless it is waived by the defendant." *State v. Simpson*, 9th Dist. Summit No. 21475, 2004-Ohio-602, ¶ 72. "[B]ecause venue is a fact that must be proven beyond a reasonable doubt by the State, a pretrial motion challenging venue is not appropriate. A defendant may only challenge venue prior to trial if it equates to an actual defect in the indictment, for example, if the indictment fails to allege venue." *State v. Reed*, 9th Dist. Medina No. 07CA0026-M, 2008-Ohio-1880, ¶ 14. If the indictment is not defective for failure to allege venue, "a defendant may only raise the issue of improper venue at trial via a Crim.R. 29 motion for acquittal, and may later appeal that decision, like any jury determination of fact, based on either the sufficiency of the evidence or manifest weight." *Simpson* at ¶ 74.

{¶14} Young's original indictment alleged that all of the charges against him took place in Lorain County. When B.B. testified, however, it became evident that she, Young, and her family lived in Huron County between the time that she was in kindergarten and the time that she was in third grade. B.B. and her family then moved to Lorain County for her fourth grade year. At the close of the State's case, the prosecutor moved to amend the indictment. The prosecutor asked that three charges (i.e., those alleged to have occurred between October 27, 2001, and October 25, 2006) be amended to reflect that they took place in Lorain and/or Huron County.

The prosecutor argued that it was appropriate to add the language "and/or Huron County" because there was evidence that those three charges may have arisen as part of a continuing course of conduct that began in Huron County and ended in Lorain County. *See* R.C. 2901.12(H). The trial court ultimately permitted the amendment over defense counsel's objection.

{¶15} Young has not argued that the trial court erred by allowing the State to amend the indictment. *Compare State v. Thompson*, 9th Dist. Wayne No. 15AP0016, 2016-Ohio-4689, ¶ 10-15. Nor has he set forth sufficiency or weight arguments to challenge the State's evidence of venue. *See Simpson* at ¶ 74. His argument is that he did not receive adequate notice of his charges because neither version of his indictment contained language charging him with a continuing course of conduct. According to Young, "[t]he proper method of indictment would be including language as to 'course of conduct' pursuant to [R.C.] 2901.12(H)."

{¶16} Young has not set forth any supporting authority for the proposition that an indictment must include the language "course of conduct" when the State intends to proceed under R.C. 2901.12(H). *See* App.R. 16(A)(7). His indictment, both as filed and as amended, alleged a venue. Further, all of his charges stemmed from sexual assaults against his step-daughter with whom he resided during the time periods those assaults were alleged to have occurred. We, therefore, cannot say that his indictment was defective on its face, such that he could challenge it without regard to the evidence at trial. *See Reed*, 2008-Ohio-1880, at ¶ 14 ("A defendant may only challenge venue prior to trial if it equates to an actual defect in the indictment, for example, if the indictment fails to allege venue."). While Young could have challenged the sufficiency or weight of the State's evidence on the basis of venue, he has not done so, and this Court will not construct an argument on his behalf. *See* App.R. 16(A)(7);

*Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out."). Young has not shown that his indictment was insufficient for failing to properly allege venue. Thus, his second assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶17} In his fourth assignment of error, Young argues that his convictions are against the manifest weight of the evidence. He argues that the jury lost its way when it convicted him based on the uncorroborated testimony of B.B. We do not agree that his convictions are against the manifest weight of the evidence.

{¶18} When a defendant argues that his conviction is against the weight of the evidence, this court must review all of the evidence before the trial court.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶19} The rape statute prohibits a person from engaging in sexual conduct with another "when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). It likewise prohibits any person from engaging in sexual conduct with another when "the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). A person commits sexual battery if he engages in sexual conduct with another when he "is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." R.C. 2907.03(A)(5). Pertinent to this case, a person commits gross sexual imposition if he has sexual contact with another when: (1) the other "is less than thirteen years of age, whether or not the offender knows the age of that person," R.C. 2907.05(A)(4); or (2) he "purposely compels the other person * * * to submit by force or threat of force." R.C. 2907.05(A)(1).

{¶20} B.B. testified that her parents divorced when she was very little and Young became her step-father when her mother remarried. At that time, Young already had one son from a previous relationship, and he and B.B.'s mother ultimately had a son and a daughter together. B.B. testified that she lived with her mother, Young, and her three siblings in multiple locations until she was 15 years old. She described how, between the ages of 5 and 15, Young sexually assaulted her on a regular basis.

{¶21} B.B. testified that she was five years old and in kindergarten the first time that Young sexually assaulted her. At that time, she and her family lived in a trailer park in Wakeman and her youngest sibling had not yet been conceived. B.B. stated that she was in her room on a warm day when Young called for her. B.B. recalled that her mother was working when Young took her into the bedroom he shared with her mother. Young told B.B. "this is going to be yours and daddy's secret" before removing all of her clothes and undressing himself.

He then lay on the bed, positioned her across his hips, and "had [her] go up and down on his penis without penetrating [her]." The act continued until Young ejaculated on his stomach. Afterwards, he once again told B.B. that the incident was going to be their secret and also told her not to tell anyone.

{¶22} B.B. testified that, once Young began sexually abusing her, he continued to do so. She testified that Young began having intercourse with her while they were still living at the trailer park and that, occasionally, she would bleed. On those occasions, Young would place her in the bathtub. She recalled one particular night when she was asleep and Young woke her because people were setting off fireworks and he wanted to do the same. She stated that Young led her outside to the side of their trailer and made her perform fellatio until he ejaculated on the ground. The two then set off fireworks before Young sent B.B. back to bed.

{¶23} For B.B.'s second grade year, her family moved to a small house in Wakeman where she shared a room with her two brothers. According to B.B., Young's sexual assaults increased after the move because her mother became pregnant with her sister. She recalled one occasion when she awoke in the middle of the night with Young on top of her. B.B. described how Young pulled down her pants, pulled down his pants, and had sex with her. She testified that Young would use condoms when he penetrated her and, afterwards, would clean himself in the bathroom and flush the condoms down the toilet. B.B. indicated that she could not count the number of times that Young penetrated her vaginally, touched her breasts or butt, and made her touch his penis. She stated that the incidents could happen at any time and, if they occurred during the day, Young generally would send her mother and brothers to the store beforehand.

{¶24} For B.B.'s fourth grade year, her family moved to a house in Grafton. She recalled one occasion at that house where Young woke her in the middle of the night and led her

outside. She indicated that her mother and younger sister were sleeping at the time and her mother did not wake as she walked by. Once she and Young got outside, he walked her into the woods. B.B. remembered being scared because she could hear animals, leaves rustling, and twigs breaking. She testified that Young brought a bowl of marijuana into the woods with them and repeatedly offered her some, but she refused. Eventually, Young had B.B. perform fellatio while he was standing and she sat on a tree branch. She testified that the act continued until Young ejaculated on the ground.

{¶25} For B.B.'s sixth grade year, her family moved to another house in Elyria. She described two incidents that occurred there. During the first incident, B.B. recalled that Young came to her room during the day, shut the door, and tried to force her pants down. She struggled with Young as he attempted to hold her down and remove his penis from his pants. As the two were struggling, B.B. saw her oldest brother open the door to her room. Her brother then saw what Young was doing, turned around, and closed the door. B.B. testified that the assault stopped following the interruption. During the second incident, B.B. recalled that Young succeeded in having intercourse with her. She testified that the incident took place following a New Year's Eve celebration. According to B.B., the rest of her family members went to bed after midnight, but Young asked to speak with her. He then took her into the basement, ordered her to undress, and had intercourse with her on a couch.

{¶26} For B.B.'s eighth grade year, her family moved to a house in Oberlin. She testified that she was vacuuming one day when she heard Young tell her mother to go to the store and take her siblings. B.B. stated that she demanded to go to the store too because she "knew what was going to happen." Young, however, interceded, and B.B. was forced to stay home. Once her mother left, Young began putting his hands on B.B., and she ran to the kitchen. She

testified that she grabbed a knife, but Young took the knife from her, carried her to his bedroom, restrained her, and had intercourse with her until he ejaculated. B.B. testified that, afterwards, Young removed the condom he was wearing and flushed it down the toilet.

{¶27} On another occasion at the Oberlin house, B.B. testified that a female friend of the family and her son spent the night on the living room couch. B.B. stated that, at some point during the night, her mother came into her room and told her that Young wanted her to lie down with him. Meanwhile, her mother went to sleep with B.B.'s younger sister. As soon as B.B. went to Young's room, he began touching her and taking her clothes off. B.B. stated that she called for her mother and yelled "no" three times during the encounter, but Young threatened "to tie [her] in a chair and make [her] watch him kill everybody else in the house" if she did not be quiet. B.B. then remained quiet while Young assaulted her. B.B. stated that Young routinely told her not to say anything after he sexually assaulted her and that she remained silent for as long as she did because she believed he would harm her or something bad would happen if she told someone what was happening.

{¶28} B.B. testified that the last time Young had intercourse with her it was the summer of 2012 and she and her family were still living at the house in Oberlin. She recalled that it was nighttime and Young and her younger sister were planning on gutting fish in the garage. B.B. described being in her room when Young came in and began making advances toward her. She started crying and, while she was still dressed, her mother came into her room. Young then told her mother that he was just talking with her, and her mother left. Once her mother left the room, Young had intercourse with B.B. She testified that the rape was quick because Young had to meet her sister in the garage. Once Young finished, he removed the condom he was wearing, flushed it down the toilet, and went outside. B.B. continued to cry until her mother came back to

her room and asked what was wrong. During the course of their conversation, B.B.'s mother asked B.B. if Young had touched her, and B.B. finally admitted that he had. B.B. testified that her mother had never asked that question before and, once she did, B.B. finally decided to tell her the truth. According to B.B., after she told her mother that Young had been raping her for the last 10 years, her mother responded by leaving the bedroom and telling her to go to sleep. The following morning, her mother sent her to a friend's house for a few days and then to her father's house. B.B. testified that her mother never called the police and told her not to tell her father what had happened. The next time she spoke with her mother was a few days later when her mother called her in the middle of the night. B.B.'s mother told her Young "had beat her up really bad," the police had been called, and she had told them about the rapes.

{¶29} Deputy Sheriff Gregory Hudson testified that, at approximately 4:30 a.m. on July 15, 2012, he responded to a domestic violence call at B.B.'s house in Oberlin. As a result of the call, Young was arrested, and Deputy Hudson spoke with B.B.'s mother. He testified that Young and B.B.'s mother had been having a party and that everyone had been drinking. He observed that B.B.'s mother appeared distraught and indicated that Young had struck her in the face. During their conversation, B.B.'s mother also informed Deputy Hudson that Young had been molesting her daughter. The deputy then referred the matter to a detective.

{¶30} After the police became involved, B.B., her mother, and two of her siblings went to live with B.B.'s maternal grandparents. B.B. testified that they all remained there until the day before Thanksgiving 2012. According to B.B., her mother's demeanor changed between the time they initially moved in with her grandparents and Thanksgiving eve. On that day, B.B. discovered text messages on her mother's phone. The messages were between her mother and Young and were "very vulgar and sexual" in nature. B.B. described her discovery of the text

messages as causing a rift between her and her mother. The two argued and, when B.B. awoke on Thanksgiving morning, she discovered that her mother had left with her two younger siblings. She testified that Thanksgiving eve 2012 was the last time she had seen or spoken with her mother and her two younger siblings. She learned that they were living at her paternal grandparents' house along with Young. There was testimony that the domestic violence charge Young faced for hitting B.B.'s mother resolved in November, the temporary protection order that had been in place lifted, and Young began residing with his family again until the grand jury issued charges related to this matter.

{¶31} B.B.'s maternal grandmother confirmed that B.B., her mother, and her two younger siblings came to stay with her and her husband in July 2012, following a 5:00 a.m. phone call from B.B.'s mother. When she first saw B.B.'s mother, she was crying, smelled of alcohol, and told her that Young had "raped her baby." She testified that B.B.'s mother remained with her until Thanksgiving eve when one of her grandchildren took B.B.'s mother's cell phone and showed it to B.B. She testified that, after B.B. looked at the cell phone, she "acted like a zombie" and would not speak to her mother. Later that night, B.B.'s grandmother saw B.B.'s mother folding clothes, but B.B.'s mother claimed that she was just cleaning up. When B.B.'s grandparents and B.B. awoke the next morning, however, they discovered that B.B.'s mother had left with her other children in the middle of the night.

{¶32} Detective James Rico interviewed B.B., her mother, and her two brothers soon after the allegations of possible sexual abuse surfaced. Detective Rico confirmed that the information he received from B.B. remained consistent from the time he first interviewed her until the trial. He testified that B.B.'s mother was supportive of her at first, but that later changed. After he initially interviewed B.B. and her mother, Detective Rico went to their house

in Oberlin and looked in the septic tank. He explained that, during the course of the investigation, he had learned that Young had been flushing condoms down the toilet and that he and B.B.'s mother did not use condoms. Detective Rico testified that, when he looked inside the septic tank at the residence, he saw eight to ten condoms floating in the sewage contained therein. Because the contents of the tank represented a biohazard, however, Detective Rico was unable to retrieve any of the condoms. He further testified that the pictures he took of the condoms were unusable due the dark conditions in the tank.

{¶33} Detective Rico testified that he asked both of B.B.'s brothers whether they had ever observed anything inappropriate happen between B.B. and Young and both denied that they had. Even so, the older brother recalled one occasion when he attempted to go inside B.B.'s bedroom while Young was with her. He told the detective that the door was shut and, when he attempted to open it, Young immediately slammed it shut before he could see anything. Meanwhile, B.B.'s younger brother recalled one occasion at the house in Oberlin where he saw Young and B.B. "in a spooning position in the bedroom." B.B.'s younger brother said that he noticed the bed sheets were pulled up to B.B.'s eyes and B.B. "looked really scared." He told the detective that Young sent him out to do chores.

{¶34} The State also presented the testimony of two women who were friends with B.B.'s family at various points in time. The first woman testified that she used to be friends with B.B.'s mother and her sons used to be friends with one of B.B.'s brothers. She described B.B. as having normal interactions with Young, but testified that Young would sometimes comment that B.B. looked "kind of sexy." She recalled one particular occasion when she and one of her sons slept over on the couch in B.B.'s house in Oberlin. She testified that she awoke in the middle of the night because she heard B.B. screaming "mom" and "no" three times. Although B.B.

sounded scared, the woman felt uncomfortable investigating herself so she remained on the couch.

{¶35} The second woman testified that she was friends with B.B.'s mom for about 19 years before they became neighbors at the trailer park in Wakeman. The woman testified that she saw B.B.'s mom on an almost daily basis at that time. According to the woman, Young drank frequently and things were more stressful when he was around. She testified that it was not unusual for Young to send B.B.'s mother to the store with the boys four to five days of the week while he remained home with B.B. According to the woman, B.B.'s mother once called her because she was concerned that B.B. had been "bleeding from her privates." She estimated that B.B. was about five years old at that time.

{¶36} B.B.'s father testified that B.B. primarily resided with her mother and Young until the age of 15, but that he had visitation with her every other weekend. Following Thanksgiving 2012 and her mother's decision to return to Young, however, B.B. came to live with him on a permanent basis. He testified that B.B.'s behavior had "changed dramatically" for the positive over the course of the last two and a half years and that both her attitude and her grades had improved. He confirmed that B.B. never recanted or otherwise admitted that she had fabricated the allegations against Young.

{¶37} The State's final witness was a former boyfriend of B.B.'s. He acknowledged that B.B.'s mother and Young did not like him and forbade him from coming into their house. He also admitted that B.B. sometimes left track practice to meet him and that he had once gotten into trouble for dancing erotically with her at a school dance. According to B.B.'s former boyfriend, B.B. eventually told him about Young's sexual assaults and never gave any indication

that she was lying. He denied that there was ever an occasion where he spoke with B.B. on speakerphone at a party and she admitted that she had lied about Young.

{¶38} On cross-examination, B.B. admitted that she had disagreements with her mother and Young because they did not want her to date and did not approve of the boys that she wanted to see. She agreed that she had snuck out of her bedroom window at least once to see a boy, had lied about being at track practice when she was really seeing a boy, and had refused to give her mother the password to her cell phone. B.B. repeatedly testified, however, that she never lied about Young's sexual assaults and never asked anyone else to lie for her.

{¶39} Young presented numerous witnesses to testify in his defense at trial. Two of those witnesses were male friends of his who stayed with him and his family at various times. The first man claimed that he lived with Young and his family for at least five years when they were in Wakeman and was extremely close with Young and his children. The man described B.B. as happy and denied that he ever noticed anything inappropriate occur between B.B. and Young. The man admitted that the family made multiple trips to the store during the week, but denied that B.B. was left behind with Young. He claimed that he was always with Young when Young was home. Nevertheless, he admitted that he would not have known if something happened in any of the bedrooms of the home because he would not go into the bedrooms if that is where Young went.

{¶40} The second male friend that Young presented in his defense also claimed to have lived with Young and his family "on and off" for several years. Notably, he testified that the first man only lived at the house "once in a while." It was his impression that B.B. always wanted to be around Young, and he denied ever having seen anything inappropriate occur

between them. He claimed that, in April 2013, he was attending a party and heard a phone call, during which B.B. admitted that she had lied about the allegations against Young.

{¶41} Young presented multiple witnesses who claimed to have heard B.B.'s phone call. In addition to the foregoing witness, he also presented the testimony of (1) that witness's fiancé, and (2) a school friend of his son who described Young as "a father figure." All three testified that they had attended a party at the house of a mutual friend along with B.B.'s former boyfriend. They testified that B.B.'s former boyfriend received a phone call at the party and placed the call on speakerphone. All three claimed that they recognized B.B.'s voice on the phone and that, during the call, she became extremely upset, lamented that she would be put in jail if forced to take a lie detector test, and told her former boyfriend that she "did this for him." B.B.'s former boyfriend, however, denied that any such phone call occurred. Moreover, on rebuttal, the State called as a witness the owner of the apartment where the alleged party had occurred. The owner denied that any such party had ever taken place or that there was ever an instance at her apartment where B.B. recanted on a speakerphone call with her former boyfriend.

{¶42} Both of B.B.'s brothers testified in Young's defense and both stated that they had never observed anything inappropriate occur between Young and B.B. The younger brother specifically denied telling Detective Rico that he once saw Young and B.B. "spooning" in bed. He also testified that the reason he, his younger sister, and his mother left his maternal grandparents' house in November 2012 was because he and his mother overheard B.B. when she was talking on the phone and her statements led them to conclude that she had lied about Young. He testified that they packed their things and left the house about an hour after overhearing that phone call.

{¶43} B.B.'s older brother testified that it was a well-known fact that his father had a drinking problem, but that he had no reason to believe that his father had sexually abused B.B. He testified that he told Detective Rico as much and could not recall ever telling him that there was an occasion when Young kept him from B.B.'s bedroom by slamming the door shut. According to B.B.'s older brother, B.B. approached him while they were living with their maternal grandparents and asked him to "lie for her" by saying that Young had touched her. She stated that she "just wanted [her mother] to leave [Young] so she could move with her dad." B.B.'s older brother stated that the conversation occurred a few weeks after he talked with Detective Rico, and he claimed that he told his maternal grandmother about it.

{¶44} Caroline Kennedy, an investigator for Lorain County Children Services, testified that she investigated Young and B.B.'s mother in 2009 following an anonymous referral for possible abuse and neglect. She conducted two visits at their home and never observed any issues that would have caused her to pursue the matter further. She testified that, as part of her investigation, she spoke with B.B. and specifically asked whether anyone was sexually abusing her. Kennedy stated that B.B. gave a negative response to that question. She also testified, however, that B.B. was only 12 years old at the time and, in her experience, it would be extremely unusual for a young abuse victim to disclose ongoing sexual abuse to a stranger, particularly when she resides with her abuser.

{¶45} B.B.'s mother also testified in Young's defense. According to B.B.'s mother, she and Young frequently had behavioral problems with B.B. She described incidents when B.B. snuck out of her window to meet a boy, lied about attending school practices to meet a boy, and made a scene dancing erotically with a boy at a school dance. She testified that, when B.B. was in middle school, she got caught sending nude pictures of herself to her boyfriend. She stated

that she and Young attempted to discipline B.B. and monitor her phone use, but B.B. continued to misbehave and refused to provide them with the password to unlock her phone. According to B.B.'s mother, B.B. routinely stated that she wanted to go live with her father when they disciplined her.

**{¶46}** B.B.'s mother testified that B.B. first claimed Young had been raping her on the night of July 10, 2012. Earlier that evening, B.B. had come home from vacation and became upset when she was not allowed to go fishing with Young and her brother. After Young returned from fishing, B.B.'s mother observed him in B.B.'s room, talking to her while her younger sister tried to get his attention. B.B.'s mother testified that B.B.'s younger sister was in the room the entire time until Young went back outside. When B.B. then told her that Young had been raping her, she stated that she did nothing because "couldn't wrap [her] head around it" and did not think it was possible. She stated that B.B. went to her father's house that weekend and, a few days later, she and Young had friends over for a party. The party occurred on July 15, 2012.

**{¶47}** B.B.'s mother admitted that, on the night of the party, Young struck her in the face and threatened to kill her. She stated that she was very upset as a result of the incident and, when the police arrived, she told them that Young had been raping B.B. Nevertheless, she testified that she began to question B.B. as time went by because the details would change when she asked her questions and B.B. gave the wrong answer when she asked whether Young was circumcised. She acknowledged that she was present when Detective Rico looked inside the septic tank at the Oberlin house, but claimed that she never saw anything in the tank, despite being down on her knees next to the detective.

**{¶48}** According to B.B.'s mom, B.B. finally came to her at some point between late October and Thanksgiving 2012 and confessed that she had lied about Young. She described

B.B. as coming into her room, grabbing her, and sobbing into her chest while repeatedly stating that she was sorry for lying and that she wanted to call Detective Rico. Then, on Thanksgiving eve, she and B.B.'s younger brother overheard B.B. talking on the phone and saying, "I had to tell my mom that or she never would have left." B.B.'s mom testified that B.B.'s statement caused her to pack her things and leave the house, along with her other two children. She testified that she returned to Young because she no longer believed B.B.'s accusations.

{¶49} B.B.'s mother acknowledged that Young had a drinking problem and that it was a source of strain in their relationship. She admitted that, after Young hit her, she testified under oath to secure a protection order against him. When she did so, she testified that he was threatening her life on a daily basis and that he had threatened to "kill all of [her] kids and make [her] watch" if she called the police. B.B.'s mother also admitted that, when she initially gave the police a statement about B.B., she said that (1) she saw Young in B.B.'s room on the night of her rape disclosure, (2) Young had his hands under the covers, and (3) B.B. was "scared, shaking, trembling and hiding her face * * *." B.B.'s mother claimed that she "exaggerated things" in her statement because she wanted the police to take B.B.'s accusations seriously. Nevertheless, she admitted that she did not call the police or tell B.B.'s father when B.B. first made the accusations.

{¶50} Finally, Young testified in his own defense. He testified that B.B.'s sexual abuse allegations were false and that he never touched her inappropriately. Much like B.B.'s mother, he testified that B.B. had a rebellious streak and became angry when they attempted to discipline her or prohibit her from seeing certain boys. According to Young, he and B.B.'s mother were always responsible for disciplining B.B. because her father was "on drugs" and her maternal grandparents "were pill poppers and * * * crazy, basically." Young admitted that he previously

had a drinking problem and would hit B.B.'s mother, but claimed that he had turned his life around since his arrest for domestic violence.

**{¶51}** Having carefully reviewed the record, we cannot conclude that this is the exceptional case where the jury clearly lost its way in convicting Young. *See Otten*, 33 Ohio App.3d at 340. To be certain, Young set forth a substantial amount of testimony in his defense, and the jury was presented with conflicting evidence. We have "consistently held[, however,] that the trier of fact is in the best position to evaluate the credibility of witnesses and resolve factual disputes." *State v. Bardos*, 9th Dist. Medina No. 15CA0082-M, 2016-Ohio-8091, ¶ 16. We "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 29. B.B. unequivocally testified that Young raped her over the course of 10 years, and, contrary to Young's argument, the record contains circumstantial evidence in support of her allegations. Young has not shown that his convictions are against the manifest weight of the evidence. Thus, his fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE JURY INSTRUCTIONS WERE IN PLAIN ERROR FOR LACK OF ANY INSTRUCTIONS AS TO VENUE AND COURSE OF CONDUCT.

**{¶52}** In his third assignment of error, Young argues that the trial court committed plain error when it failed to instruct the jury on venue. Specifically, he argues that the court should have defined venue for the jury and should have instructed them on course of conduct. For the reasons that follow, we reject Young's argument.

**{¶53}** Young acknowledges that his counsel did not object to the jury instructions at trial, so he is limited to arguing plain error on appeal. *See, e.g., State v. Ocasio*, 9th Lorain No.

15CA010773, 2016-Ohio-4686, ¶ 9. As noted, Crim.R. 52(B) circumscribes this Court's ability to recognize plain error in three ways. "First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. Third, the error must have affected * * * the outcome of the trial." (Internal citations omitted.) *Barnes*, 94 Ohio St.3d at 27. This Court notices plain error only in exceptional circumstances to prevent a manifest miscarriage of justice. *Long*, 53 Ohio St.2d at paragraph three of the syllabus.

**{¶54}** With regard to Young's first rape charge, the trial court instructed the jury as follows:

> Before you can find [Young] guilty of rape as charged in this count, you must find beyond a reasonable doubt that the State of Ohio has proven all of the essential elements which are as follows. That on or about October 27th, 2001 to October 25th, 2006 [Young] did engage in sexual conduct with another, [B.B.], who was not the spouse of [Young], and that at the time of the sexual conduct alleged, [B.B.] was a person under the age of 13 years whether or not [Young] knew the age of [B.B.] *and that the offense occurred in Lorain or Huron County, Ohio.*

(Emphasis added.) Likewise, for each of Young's remaining charges, the court instructed the jury that they had to find beyond a reasonable doubt that the State had proved the offenses occurred in either Lorain (for the offenses occurring during later time periods) or Lorain and/or Huron (for the offenses occurring during the earliest time period).

**{¶55}** In *State v. Dixon*, 9th Dist. Summit No. 19971, 2000 WL 1675042 (Nov. 8, 2000), this Court rejected an argument similar to the one that Young is making on appeal. There, we concluded that no plain error occurred with regard to a venue instruction where the court instructed the jury that they had to find beyond a reasonable doubt that "on or about November 5, 1999, in Summit County, Ohio, [Defendant], knowing he was under detention, purposely broke such detention." *Id.* at *4. The instruction given in *Dixon* bears resemblance to the instructions

given in this matter. If anything, the instructions here drew even more attention to the fact that the State had to prove venue, as the *Dixon* instruction simply referenced the county of venue in conjunction with the date of the offense therein. Here, the court listed the county of venue as a separate element that the jury had to find in conjunction with each offense.

{¶56} Even assuming that the court erred by not giving the jury a specific instruction on course of conduct, Young has not shown that error affected the outcome of his trial. *See Barnes*, 94 Ohio St.3d at 27. He has not separately challenged the sufficiency or weight of the evidence regarding venue on appeal, nor has he undertaken any analysis aimed at showing that the evidence here would not have supported a finding that he engaged in a course of conduct. *See* App.R. 16(A)(7). As noted, the evidence at trial showed that Young sexually abused the same victim, his step-daughter, for approximately ten years. *See* R.C. 2901.12(H)(1), (5). Because Young has not shown that a course of conduct instruction would have changed the result in this matter, his third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN ENGAGING WITH THE STATE OF OHIO
IN AN EX PARTE CONVERSATION DURING JURY DELIBERATIONS
WITHOUT THE PRESENCE OR CONSENT OF THE APPELLANT OR HIS
COUNSEL[.]

{¶57} In his first assignment of error, Young argues that the trial court erred when it discussed questions from the jury with the prosecutor outside of his and his counsel's presence. Because Young has not demonstrated prejudice as a result of the court's discussion with the prosecutor, we must conclude that his argument lacks merit.

{¶58} "A criminal defendant has a fundamental right to be present at all critical stages of his trial." *State v. Hach*, 9th Dist. Summit No. 27409, 2014-Ohio-5113, ¶ 6. *See also* Crim.R. 43(A)(1) (defendant's physical presence generally required "at every stage of the criminal

proceeding and trial"). Even so, "[a] criminal defendant's absence * * * 'does not necessarily result in prejudicial or constitutional error.'" *Hach* at ¶ 6, quoting *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 90. "'[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" (Emphasis omitted.) *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 100, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-108 (1934).

> Before a defendant may prevail upon the argument that he was denied due process as a result of his absence, * * * (1) "[t]he record must affirmatively indicate the absence of [the] defendant or his counsel during a particular stage of the trial," * * * and (2) the defendant must show that the absence prejudiced his defense.

(Alterations sic.) *State v. Davison*, 9th Dist. Lorain No. 10CA009803, 2011-Ohio-1528, ¶ 7, quoting *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 105, quoting *State v. Clark*, 38 Ohio St.3d 252, 258 (1988). In the absence of a showing of prejudice, any error in not securing the defendant's presence is harmless. *See Hach* at ¶ 6-7. *Accord State v. Kiley*, 9th Dist. Lorain No. 10CA009757, 2011-Ohio-1156, ¶ 11-13.

{¶59} After deliberations commenced, the jurors notified the court that they had two questions. The trial judge initially discussed the questions on the record with the prosecutor in the absence of Young and his counsel. The judge noted that defense counsel was unavailable because he was presenting an appellate argument. The judge stated, however, that he would seek defense counsel's input before providing the jury with answers to their questions. The judge then read the two jury questions into the record, noted that they were "not uncommon questions," indicated how he proposed to respond to them, and asked the prosecutor for her input. Following a brief response from the prosecutor, the judge made a notation of his proposed answers before going off the record. When the matter resumed, defense counsel was present, and the trial judge

read him both the jury's questions and the proposed answers. Defense counsel objected to the judge's second proposed answer and, as a result of his objection, the judge amended the answer.

{¶60} Young argues that he was prejudiced when the court and prosecutor met outside of his and his counsel's presence, "engaged in a lengthy analysis," and collaborated in fashioning answers to the jury's questions. According to Young, their early collaboration placed him at "an extreme disadvantage" because they "had already determined as a unified front" what the answers to the jury's questions should be.

{¶61} The record does not support Young's contention that the trial judge and the prosecutor engaged in a lengthy analysis. The record reflects that their discussion was relatively brief, and the prosecutor's contributions were minimal, at best. Moreover, the trial court did not ultimately read the jury the answers that he and the prosecutor discussed. Instead, he first discussed the answers with defense counsel and changed one of his proposed answers based on defense counsel's objection. The defense, therefore, had a meaningful opportunity to contribute to the discussion regarding how the jury's questions would be answered. Furthermore, the record supports the trial judge's observation that the questions here were "not uncommon questions." The first question was whether the jurors could have all of the trial exhibits, and the second question was whether they could have a witness list. The court ultimately told the jurors that they already had all the documents admitted in the case and that they had to "rely on [their] collective recollection as to who testified." Although it was error for the trial court to proceed without Young and his counsel being present,[1] Young has not explained how, had he and his

---

[1] This Court has recognized that "[i]f the jury returns to the courtroom to ask a question about [the jury] instructions * * *, a defense lawyer may waive his client's presence." *Kiley*, 2011-Ohio-1156, at ¶ 13. Because Young's counsel was also absent when the trial court consulted the prosecutor and did not waive Young's presence, however, that rule of law does not apply here.

counsel been present at the earlier conversation between the judge and the prosecutor, the answers to those questions would have changed or the result in this matter would have been different. *See Davison*, 2011-Ohio-1528, at ¶ 7, quoting *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, at ¶ 105, quoting *Clark*, 38 Ohio St.3d at 258. *See also Kiley*, 2011-Ohio-1156, at ¶ 11-13. Accordingly, he has not demonstrated prejudice, and his assignment of error is overruled on that basis.

## ASSIGNMENT OF ERROR V

THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION TEN OF THE OHIO CONSTITUTION[.]

**{¶62}** In his fifth assignment of error, Young argues that he was deprived of the effective assistance of counsel because his counsel: (1) introduced bad acts evidence that would have been otherwise inadmissible, and (2) failed to question a juror when that juror indicated that she was familiar with the prosecutor. Upon review, Young has not shown that he received ineffective assistance of counsel.

**{¶63}** In order to prevail on a claim of ineffective assistance of counsel, Young must show that his "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. Thus, a two-prong test is necessary to examine such claims. First, Young must show that counsel's performance was objectively deficient by producing evidence

that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687. Second, he must demonstrate that but for counsel's errors, there is a reasonable probability that the results of his trial would have been different. *Keith* at 534.

**Bad Acts Evidence**

{¶64} As noted, the police first learned of B.B.'s sexual assault allegations on the same night that Young was arrested for domestic violence. Defense counsel was the first person at trial to reference the incident. During his opening statement, defense counsel informed the jury that Young had become intoxicated, had struck his wife, and was arrested and charged with domestic violence. According to Young, that evidence would have been inadmissible had defense counsel not referred to it in his opening statement. Young argues that the evidence distracted the jurors and painted him as a bad person who commits acts of violence against his family members.

{¶65} "Counsel's strategic or tactical decisions will not form the basis of an ineffective assistance of counsel claim." *Barger*, 2016-Ohio-443, at ¶ 42. Even assuming that the domestic violence incident that precipitated the reporting of B.B.'s allegations of rape would not have been admissible here if not for defense counsel's decision to introduce it, the record supports the conclusion that counsel made a strategic decision to introduce that evidence. Young's defense was that B.B. fabricated the allegations against him for two reasons. Those two reasons were that B.B.: (1) was angry with her mother and Young for restricting her social life and not allowing her to date, and (2) had had enough of Young becoming intoxicated and striking her mother. Both Young and B.B.'s mother testified that the night of his arrest was not the first occasion that he had struck her. Defense counsel, therefore, relied on Young's behavior as motive for B.B. to create false accusations against him. Because the record supports the

conclusion that defense counsel made a strategic decision to introduce the foregoing evidence, Young has not shown that he received ineffective assistance of counsel on that basis. *See id.*

**Juror's Familiarity with the Prosecutor**

{¶66} Next, Young argues that his counsel was ineffective because he allowed a juror to be seated without inquiry after the juror disclosed that she knew one of the assistant prosecutors. Young's brief is devoid of any citation to the transcript that would allow this Court to identify the juror to whom Young is referring. *See* App.R. 16(A)(7). Upon review of the State's brief, however, and the cited portion of the transcript contained therein, we cannot conclude that defense counsel acted unreasonably when he failed to question the juror. *See Keith*, 79 Ohio St.3d at 534, citing *Strickland*, 466 U.S. at 687.

{¶67} The record reflects that, after voir dire concluded but before the jurors were sworn in, one of the jurors had a discussion with the court's bailiff about one of the assistant prosecutors. The bailiff then informed the court and the attorneys on the record that the juror had failed to recognize the assistant prosecutor's name during voir dire, but

> at some point when she saw [the assistant prosecutor], it then rung a bell that she did know her. She indicated that their kid or kids played soccer together. She knows her but doesn't socialize with her, doesn't hang out with her and obviously didn't recognize her by name. She had to see a face.

Following the bailiff's description of the foregoing discussion, defense counsel declined the court's invitation to inquire further of the juror. The court then swore in the jurors, and the trial commenced.

{¶68} Young has made no attempt to argue why it was objectively unreasonable for defense counsel to decline the invitation to question the juror who spoke with the court's bailiff. *See* App.R. 16(A)(7). The prosecutor whom the juror recognized merely acted as an assistant prosecutor in the proceedings, not as lead counsel. Moreover, the juror indicated that she did not

recognize the assistant prosecutor by name, did not socialize with her, and only knew of her because, at some point, both of their children played the same sport. Absent any additional argument from Young, we will not conclude that defense counsel acted unreasonably in allowing the juror to be seated without further inquiry. *See Keith* at 534. Young's fifth assignment of error is overruled.

## III.

**{¶69}** Young's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.


APPEARANCES:

RICHARD H. DRUCKER, Attorney at Law, for Appellant.

BRETT F. MURNER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.