[Cite as *State v. Armengau*, 2017-Ohio-4452.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                 :

      Plaintiff-Appellee,                   :

v.                                            :            No. 14AP-679
                                                         (C.P.C. No. 13CR-2217)
Javier Armengau,                              :

      Defendant-Appellant.                  :            (REGULAR CALENDAR)

---

D E C I S I O N

Rendered on June 22, 2017

---

**On brief:** *Michael DeWine*, Attorney General, *Katherine Mullin*, and *Jocelyn K. Lowe*, for appellee. **Argued:** *Jocelyn K. Lowe*.

**On brief:** *Timothy Young*, Public Defender, and *Francisco E. Lüttecke*, for appellant. **Argued:** *Francisco E. Lüttecke*.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Javier Armengau, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of one count of public indecency, four counts of sexual battery, one count of kidnapping, one count of rape, and two counts of gross sexual imposition.

## I. PROCEDURAL BACKGROUND

{¶ 2} During the period of the indicted offenses, appellant was an attorney licensed in Ohio, with a central Ohio general practice that over time became focused on

criminal defense work. The women who accused him of sexual misconduct were clients or relatives of clients; two of the accusers also worked in appellant's law offices.

{¶ 3} Columbus police began investigating appellant in 2013 after one of the accusers, C.C., hired appellant to represent her son in criminal proceedings and complained of appellant's unwanted physical advances. After appellant's arrest at the termination of that investigation, other accusers began coming forth, leading to an 18-count indictment issued by the Franklin County Grand Jury alleging crimes victimizing five different women: Counts 1, 2, and 3 alleged kidnapping, public indecency, and gross sexual imposition involving accuser C.C., all occurring on or about April 4, 2013. Counts 4 and 5 alleged rape and kidnapping involving accuser L.G., arising out of a single incident occurring between August 1 and August 31, 2008. Counts 6 and 7 alleged sexual battery and gross sexual imposition involving accuser A.C., occurring between January 1, 1998 and December 31, 2010. Count 8 alleged gross sexual imposition involving accuser K.R., occurring between August 8 and September 17, 2008. Counts 10 through 13 alleged rape involving accuser L.M. Count 14 alleged kidnapping involving L.M. in connection with one of the rape counts. Counts 15 through 18 alleged sexual battery against L.M. All the counts involving L.M. alleged conduct occurring between January 1, 2002 and December 31, 2008. All counts involving all accusers alleged that the criminal conduct occurred in Franklin County, Ohio.

{¶ 4} The state provided a bill of particulars on June 1, 2014, amended it on the eve of trial on June 6, 2014, and further amended it at the close of the state's case on June 22, 2014. The state, over objection, also verbally amended the indictment during trial to conform to certain testimony. The specifics of these amendments are more extensively developed below in connection with appellant's first and sixth assignments of error.

## II. TRIAL PROCEEDINGS

{¶ 5} The prosecution relied chiefly on the testimony of the five accusers. In addition, three other similarly situated women testified as other-acts witnesses regarding events that did not give rise to further criminal charges. Two of these described appellant's conduct in connection with consensual sexual relationships, and one testified regarding appellant's offensive conduct or statements towards her.

{¶ 6} The first accuser that testified at trial was C.C. She stated that she hired appellant to represent her son in a criminal matter, and met with appellant at his office on South High Street in Columbus. On April 4, 2013, C.C. received a call from appellant's secretary asking her to come to appellant's Columbus office to discuss the upcoming trial. During the course of their interview, appellant retrieved a legal file and sat next to C.C., brushing up against her. Appellant then opened the file, C.C. testified, and when the file fell to the floor, he gripped C.C.'s left arm firmly and put his right arm down her shirt, pulling her bra away from her breasts. C.C. testified that she was unable to move during this episode because of appellant's physical restraint. C.C. then attempted to readjust her clothing, and realized that appellant had stood up and unzipped his pants, placing his penis before her face. C.C. was offended, and quickly left the office, calling a friend to pick her up. She later called her sister, K.C., to complain of the episode.

{¶ 7} K.C. herself testified to confirm the phone call from C.C. She described her sister as frantic during the call, which prompted K.C. to advise C.C. to call the police.

{¶ 8} After C.C. reported the incident to the Columbus police, investigators contacted C.C. and asked her to set up further meetings with appellant that could be recorded as evidence. She exchanged several recorded phone calls with appellant and eventually met him at a restaurant, where their conversation was recorded and observed by police. During this meeting, appellant again made unwanted advances towards C.C. by repeatedly putting his hand on her thigh, and did not deny his prior conduct during their meeting at his office. In the course of C.C.'s testimony, these recordings were played for the jury in open court.

{¶ 9} Officer Jeffrey Cain, of the Columbus Division of Police, testified that he went to C.C.'s apartment on April 4, 2013 to take the report of a sexual assault.

{¶ 10} Corporal Jeff Zech, of the Franklin County Sheriff's Office, testified regarding the technical aspects of the audio recording process used for the restaurant meeting between C.C. and appellant.

{¶ 11} Detective Jason Sprague, of the Columbus Division of Police, testified regarding the preparations for the restaurant meeting between C.C. and appellant. He was in the vicinity during the meeting but had difficulty picking up the conversation because

recording sound was poor. After appellant's arrest upon leaving the restaurant, Detective Sprague participated in a recorded interview with appellant at the police station.

{¶ 12} During Detective Sprague's testimony, the recording of appellant's post-arrest interview was played in open court. In this interview, appellant described in detail his recent meeting with C.C. at his office regarding her son's case. He denied any inappropriate conduct on his part towards C.C. on that or any other occasion. He professed to be baffled by some of C.C.'s text messages and phone calls that contained flirtatious or sexual references, and stated that he had previously asked her to refrain from such comments.

{¶ 13} Detective Jeffery Ackley, of the Columbus Division of Police, testified about his participation in the investigation. He acted as security backup and an observer during the restaurant meeting. His visual observations corroborated C.C.'s testimony regarding appellant's physical actions, although the ambient noise prevented him from overhearing their conversation directly. He was able to make a partial video recording of the meeting using his personal recording device, and this was later transferred to CD by investigators. The video was partially played for the jury but did not include any of appellant's alleged physical advances.

{¶ 14} On cross-examination of C.C., defense counsel played a video recording made in Columbus police facilities during a telephone conversation between C.C. and her incarcerated son, who was awaiting trial for aggravated murder and other charges. In the recorded conversation, C.C. several times assured her son that, due to the developing conflict with appellant, the son would receive not only new defense counsel but a different prosecutor and judge for his case. Upon further questioning, C.C. testified that she felt that these changes would benefit her son, because she was dismayed by the harsh 43-year sentence offered to her son in plea discussions, and doubted whether appellant had obtained the best available result.

{¶ 15} In his testimony at trial regarding C.C.'s accusations, appellant denied any inappropriate conduct towards C.C. He described his representation of her son against several extremely serious charges, including aggravated murder. Appellant testified that his primary contact was with other family members or his jailed client via telephone, because C.C., after two brief initial meetings, made herself unavailable. While other family

members came to various court hearings, C.C. did not. After several months, in April 2013, the trial date approached and appellant advised his client that the prosecution's 43-year offer was preferable to trial and a life sentence. Appellant felt that the state had put together a very solid investigation and his client would have little chance in front of a jury, and a plea to the indictment without an agreed sentence would result in more time.

{¶ 16} Appellant testified that prior to the April 4 meeting, he instructed his assistant to contact C.C. and arrange a meeting to update C.C. regarding the case. The meeting was arranged for April 4, and C.C. arrived as agreed. Her behavior struck him as odd. He asked about an individual that she had previously introduced to him as her husband, and she laughed and stated that she had this individual arrested. They then discussed her son's case, and C.C. expressed extreme disappointment with the plea offer. Appellant explained the situation to her and showed her some of his case notes. He denied sitting next to her on the office couch or touching her in any way. He was taken aback when C.C., on leaving the office, asked if he would like to have dinner some time.

{¶ 17} Appellant testified that the next day he learned from his client, C.C.'s son, that the client no longer wanted to accept the plea deal. C.C. then called him, and, in one of the conversations that he later learned was recorded by her at police request, asked for a dinner meeting to further discuss her son's plea. During the phone call, C.C. made several flirtatious or sexually charged remarks, which appellant deflected. He was not particularly put off by this because he considered C.C. to be somewhat unstable or unpredictable, and in any case he had experienced flirtatious comments from other clients and could usually steer such conversations back to business without difficulty. Appellant then described the meeting with C.C. at the restaurant, and denied putting his hand on her thigh or touching her inappropriately.

{¶ 18} The defense called S.K., C.C.'s former roommate. She testified that, in March 2013, C.C. approached her about blackmailing appellant. C.C. appeared frustrated by appellant's representation and the poor plea offer made by the state in her son's murder case. C.C. was also upset about the amount of money she had paid appellant for her son's representation. C.C. told S.K. that she had lied regarding the sexual incident so that she could sue appellant and get a new attorney for her son. She promised to give S.K. a car if S.K. would participate in the blackmail scheme. S.K. refused to participate when she

learned that appellant had been arrested, whereupon C.C. kicked S.K. out of their shared apartment.

{¶ 19} The second accuser to appear at trial was A.C. She testified that she began working for appellant in the late 1990's, during the time that appellant represented her in a custody dispute. Appellant's principal office at the time was in Marion, Ohio. A.C. worked for appellant for over seven years, and she eventually resided in one of his rental properties. Early in the working relationship, A.C. testified appellant approached her when she was working in his Marion office, rubbed her shoulders, put his hands down her shirt, and eventually requested that she perform oral sex. She acquiesced. These incidents went on for some time, including an incident when she was in his Columbus office during 2005 or 2006. She could provide no specific dates for any of the incidents except for one occurring on September 11, 2001. On direct and cross-examination, A.C. agreed that she has a lengthy history of disabling mental illness and experienced many civil and criminal legal difficulties as a result. She stated that the sexual activity with appellant was "to an extent" consensual, but that at the time she felt she had little choice but to comply with his demands. (Tr. at 834.)

{¶ 20} Appellant testified that he first met A.C., as she had testified, during representation of her in a custody matter in 1999. He agreed that she had worked for him off and on over the years and had rented a home from him. Appellant denied having any sexual relationship of any kind with A.C. He represented her on numerous legal matters, some arising from her mental health issues, which often led to run-ins with police. This legal representation ended when A.C. complained that appellant was taking too long obtaining a dissolution for her.

{¶ 21} The third accuser to testify was L.G., who testified that she met appellant in 2006 or 2007 when she retained appellant to represent her son in a legal matter. Their interactions began professionally, but she claimed appellant soon began acting inappropriately. She claimed that at one point, appellant demanded oral sex in exchange for a promise to help her son. On several occasions he stripped naked in front of her in his office and masturbated. Later, on the eve of her son's court appearance in September or October 2007, she went to appellant's office for a meeting. Appellant and another man were drinking in the office. L.G. claimed appellant offered her a drink and suggested that

if she performed oral sex on both men, her son's case would have a better outcome. L.G. refused and left the office.

{¶ 22} L.G. testified that next day, while in court attending her son's sentencing hearing, she realized that the man she had seen the night before with appellant was, in fact, the judge in her son's case. She was extremely upset when the judge imposed the maximum sentence on her son at this hearing. After the hearing, L.G. claimed appellant forced her to perform oral sex on him in an attorney conference room in the courthouse, physically restraining her from leaving. She claimed that after this, she was violently ill as she rejoined her family outside. L.G. testified that she had made a police report about the incident in 2009, and refiled it in 2013 when learning of appellant's arrest.

{¶ 23} Prosecution witness S.W. testified that she was L.G.'s aunt and had observed interaction between L.G. and appellant. She advanced some funds for appellant's fees in the defense of L.G.'s son and later took L.G. to retrieve paperwork from appellant's office after L.G. had terminated the attorney-client relationship on behalf of her son. S.W. observed a heated confrontation between L.G. and appellant, prompted in part by appellant's refusal to return the son's case file. At some point in the conversation, L.G. called appellant a rapist. From appellant's office, they drove to the Columbus police department, where L.G. went inside for at least two and one-half hours while S.W. remained in the car. On previous occasions, S.W. had accompanied L.G. for case conferences, and felt that appellant was upset that L.G. was not alone and would not come up to his office alone.

{¶ 24} Prosecution witness J.B. testified that she was L.G.'s de facto mother-in-law, as L.G. had lived with her son for 24 years even though the two were not married. She attended a meeting with L.G. at appellant's office in 2009 and observed an argument or scene in which L.G. called appellant a rapist. Thereafter, she rode in the car with L.G. and S.W. to the police station, and testified that L.G. was in the police station only 15 or 20 minutes. On another occasion, J.B. attended a hearing for her grandson at the courthouse and waited outside in the hall during proceedings. J.B. testified that, at some point, L.G. emerged from the courtroom and became violently ill. When J.B. asked what was the matter, L.G. replied "if you only knew." (Tr. at 1291.)

{¶ 25} On cross-examination of L.G., the defense offered the dates and results of L.G's son's criminal cases, and the dates of appellant's representation in those cases, to impeach her testimony. In particular, the defense introduced court records indicating that her son had received only community control, rather than prison, in his appearance before the trial judge she identified as associating with appellant.

{¶ 26} In his testimony regarding his contact with L.G., appellant agreed that he had represented her son in a criminal case. He also noted that he had represented her personally in several criminal cases in 2006, as well as her other son during the same period. Appellant denied all allegations by L.G. regarding sexual conduct. He testified that his representation of her son ended when the son received probation in the cases on which appellant worked, but that she asked him to appear at sentencing involving the son's other case. On that occasion, appellant spoke briefly with L.G. before leaving after the son's current counsel, a public defender, arrived.

{¶ 27} Attorney Emily Huddleson testified for the defense regarding L.G.'s accusations. She stated that she was the public defender who represented L.G.'s son at the sentencing hearing in question. She testified that after sentencing, she and L.G. walked out in the lobby together, were met by an older woman, and the three discussed the sentence and the reasoning behind it for 20 or 30 minutes. Despite the fact that Huddleson was assigned counsel for all four cases involving L.G.'s son that day, L.G. complained to Huddleson that she had paid appellant a lot of money and felt he should still be there. Huddleson testified that appellant was initially present at the hearing but not there for the conclusion when the judge imposed a prison sentence on L.G.'s son. Huddleson described L.G. as furious after her son received prison time. Huddleson did not observe L.G. crying, being sick to her stomach, or going into a courthouse conference room with appellant or anyone else after the hearing.

{¶ 28} The fourth accuser to testify was K.R. K.R. testified that appellant represented K.R.'s boyfriend in a case in which he had been accused of domestic violence against K.R. Despite being the victim of the domestic violence at issue, K.R. met with appellant to pursue dropping the charges. Appellant subsequently represented K.R. in a criminal matter of her own. Before her trial in September 2008, K.R. testified they met in appellant's Marion office, where he offered her a drink, rubbed her shoulders, and began

feeling her breasts. K.R. refused to have sex with appellant, whereupon appellant began masturbating in front of her. K.R. told her mother about the incident, and reported the incident to the bar association, police, and a judge of the Marion County common pleas court. After the incident, she obtained new representation. Despite the statement that she gave to police and court, she heard nothing more from local authorities. Her own criminal case concluded with a guilty plea and a one-year sentence in prison. The Columbus Bar Association referred her complaint to the Supreme Court of Ohio, and a representative of the Supreme Court interviewed her regarding her allegations. To her knowledge, nothing came of the matter. After learning of appellant's 2013 arrest involving similar allegations, she contacted a detective with the Columbus police to renew her allegations in the matter.

{¶ 29} Regarding K.R., appellant testified that he recalled representing her in 2008, when they disagreed about a plea offer from the prosecution. She terminated representation when he refused to seek a continuance on what he felt were unwarranted medical grounds. He was later summoned to court for a pretrial and was requested by the prosecution and the judge to arrive early. When he arrived, the judge and prosecutor informed him that K.R. had reported a sexual assault. He withdrew from her case, and a new lawyer was appointed. Appellant denied any sexual misconduct with K.R.

{¶ 30} The final accuser to testify was L.M., who described a long history of coerced sexual relations with appellant. Her testimony with regard to dates was generally vague, and often established only by reference to the age of her young daughter, born in 1997, during the various incidents described.

{¶ 31} L.M. described her background as an immigrant from Venezuela with limited English. She came to America with her Venezuelan fiancé, and after they married in Florida he took a job in Ohio. She testified that she first retained appellant in late 1998 or early 1999 to represent her in divorce proceedings. She selected him based on his ability to communicate in Spanish. She also had difficulties with her immigration status, which was solely based on her then-husband's student visa, and appellant advised her to delay the divorce while dealing with these immigration issues. As a result, the divorce action went on for a considerable time, and L.M. met many times with appellant. She traveled from her home in Groveport, in southeast Franklin County, to appellant's office in Marion for these meetings, which appellant usually scheduled for Friday afternoon or

Saturday. At first she brought her infant daughter along, but approximately three months after taking the case appellant requested that she not bring the child to meetings.

{¶ 32} The first incident she claimed occurred about four or five months after she retained appellant. She testified that during an office conference at appellant's Marion office, appellant offered L.M. a cup of coffee, and thereafter she lost consciousness. She awoke alone on appellant's office couch with her clothes in disarray and indications that she had experienced sexual intercourse. She felt confused, as if drugged or drunk. After a short time, appellant returned to the room and told her she had fainted. As a result of this incident, L.M. avoided seeing appellant for the next two months.

{¶ 33} L.M. resumed contact with appellant after a series of phone calls from him in which he advised that she was at risk of deportation and would lose custody of her daughter. Around this time in 1999, appellant provided a tenant reference that helped L.M. move from Groveport to an apartment in Dublin, in northern Franklin County and thus closer to Marion. She claimed that she met again with appellant in his Marion office at this time, and another assault occurred. After briefly discussing her case, appellant suddenly approached her and pulled down his pants. Appellant threatened a poor result in her legal matters if she did not perform oral sex. He placed his hands behind her head, thereby "restraining [her] head against his penis," told her to "do it," and forced his penis into her mouth. (Tr. at 1483.)

{¶ 34} L.M. testified that after that incident sexual conduct between appellant and L.M. was frequent over approximately the next three years, always under the implied threat that if he dropped her case she would lose her immigration status and custody of her daughter. These events first took place at appellant's Marion office, where appellant eventually hired her to do office work to help pay her legal bills. Later appellant kept a residential apartment in Marion and took her there. Some incidents also took place at her apartment in Dublin, where appellant would ask L.M. to lock her daughter in another room. Although L.M.'s testimony did not provide details of any specific instances for most of the abuse occurring after the two specific incidents described above, she did testify in more detail about later events that formed the basis for two of the rape charges: sometime in 2000 or 2001, appellant drove L.M. in a white truck from his Marion office to a rural field where he forced her to have vaginal sex. Six months later, he repeated the offense.

{¶ 35} L.M. testified that around the time that her daughter was three and one-half or four years old, L.M. became pregnant by appellant and appellant insisted that she have an abortion. The last time she claimed she had sexual contact with appellant was 2003. This was the year in which she obtained her permanent U.S. residency, and with her immigration status settled she no longer felt compelled to submit to appellant's demands.

{¶ 36} L.M. learned of appellant's arrest in 2013 when her daughter emailed a link to a newspaper story. From this she learned that she was not the only person who claimed to suffer appellant's advances. After discovering this, L.M. called appellant to tell him that she was glad that the arrest would prevent him from taking advantage of other women. L.M. then contacted the Columbus police detective named in the news story to complain of the past incidents.

{¶ 37} On cross-examination, L.M. denied that appellant had ceased representing her in her divorce case by 2001. Defense counsel offered docket items to establish that a different attorney appeared on her behalf in the domestic action after that time. L.M. responded that many attorneys had represented her in different matters through this time, but she felt certain that appellant continued to act on her behalf. She acknowledged that her original divorce action was dismissed and she eventually divorced under a new case filed in 2003 by another attorney. She also acknowledged that, despite her professed hatred for appellant arising from past abuse, she had often approached appellant for informal assistance with legal or practical matters over the years during and after the abusive conduct. She stated that she viewed this assistance as repayment for past abuse: "I wanted to take advantage of him because he abused me so – for so long. * * * So he abusing [me] so long, so he has to do it for me." (Tr. at 1645.)

{¶ 38} Generally, appellant testified that he had a long-standing professional relationship with L.M., beginning when L.M. approached him for representation in a divorce matter. Even after his representation of her in her divorce matter terminated in approximately 2001, appellant testified L.M. repeatedly sought his assistance in several legal and non-legal matters. Regarding the duration of his legal representation, appellant testified that he filed L.M.'s divorce paperwork in December 1999 and withdrew from representation in 2001. Other attorneys took her case thereafter. In 2004, appellant and his wife separated briefly, and appellant and L.M. dated for about two weeks. Appellant

denied ever having any type of sexual contact with L.M. at any other time during their relationship.  Their brief dating relationship ended abruptly when L.M. told appellant she was pregnant, and appellant, who had undergone a vasectomy, understood that she had been seeing other men. He denied arranging an abortion for her.

{¶ 39}  The next witness was L.L., who was not the object of any indicted offenses, but testified as to appellant's conduct when he represented her in 2009 as she faced a murder charge.  The defense objected unsuccessfully to this "other acts" evidence.

{¶ 40}  L.L. testified that during one of her pre-trial meetings with appellant in a jailhouse conference room, appellant illustrated his views on witness credibility by stating that "he could rape [her] in the room and it would be [her] word against his and nobody would be the wiser."  (Tr. at 1794.)  Appellant also stated on that occasion that L.L. could crawl under the table and perform oral sex on him because there were no correction officers around, and it would be only her word against his if she complained.

{¶ 41}  In his testimony, appellant denied making any such comments to L.L.

{¶ 42}  M.H. was another witness offered by the prosecution for "other acts" testimony, again over objection.  M.H. testified that appellant represented her as her attorney for over a decade, beginning when she was 17 years old and incarcerated in the juvenile detention facility.  Upon initial release, she and appellant met at his Marion office, went to dinner, and went back and had sex in his office.  Over the ensuing 12 years, appellant represented M.H. on multiple cases but she never paid him.  They continued to have sex during this time, and M.H. accompanied appellant on a vacation to Florida.

{¶ 43}  Appellant testified that he met M.H. at the very beginning of his legal career, when he substituted for an attorney who had failed to appear at the Marion County Juvenile Center.  M.H. was 17 and charged with a felony.  She later approached appellant for representation in a divorce.  Rather than going on a dinner date followed by sex, as described by M.H., appellant recalled that they had dinner with M.H.'s stepfather and mother, and he left that dinner meeting alone.  Appellant adamantly denied ever having sex with M.H.  He agreed that he continued to represent her in various criminal matters for 12 years after the initial case.

{¶ 44}  C.P. testified over objection as the third and final "other acts" witness.  She testified that she met appellant about handling her divorce.  He did not do so because she

eventually proceeded with a dissolution in another state. She then retained him to represent her boyfriend in a criminal case. C.P. acted as a liaison between the boyfriend and appellant while the boyfriend was incarcerated. During one jail call, which was recorded, C.P. told the boyfriend that appellant had slapped her buttocks while she was leaving appellant's office one day. Appellant learned of this conversation and told her he was upset about this both because it would create friction with his client and because he knew that all jailhouse calls were recorded. Later, after appellant was removed from the boyfriend's case because he was a potential witness, C.P. and appellant began a consensual sexual relationship. This continued intermittently until just prior to appellant's trial.

{¶ 45} Appellant's testimony with respect to C.P. denied any sexual conduct between them. He testified that in the course of his criminal defense practice, his office routinely obtained and reviewed audio discs of recorded jailhouse phone conversations involving many of his clients. After reviewing the recorded jailhouse phone call in which C.P. told her boyfriend that appellant had slapped or groped her buttocks, appellant asked for a meeting to explain why she would make such a false statement to his client. She stated that she was upset by reports of the boyfriend's past infidelity and merely wished to make the boyfriend jealous. He then advised her to be cautious with such conversations.

{¶ 46} In addition to his testimony addressing the specific accusations presented by the state's witnesses, appellant testified in his case-in-chief regarding his background. He stated that he graduated from Capital Law School in 1998 as an older, non-traditional student with a growing family. He clerked with an experienced criminal defense attorney in Marion, Ohio, during law school, and shared space in that office for one year after passing the bar. He then secured his own space and began his own practice in Marion and, eventually, in Columbus, Mansfield, and Cleveland. His practice, general at first, eventually focused on criminal defense with a smaller proportion of domestic and civil litigation. He testified that he believed the accusations against him were the result of a coordinated campaign by the Franklin County Prosecutor's Office, the Attorney General, and the Columbus police to remove him from the practice of law because of his effective advocacy in criminal cases.

{¶ 47} The defense presented testimony from several current or former female employees and clients of appellant's practice. These witnesses testified that they had never

experienced or witnessed any misconduct by appellant. The defense also sought to attack the credibility of the accusers by introducing testimony, photographs, and documentary evidence that conflicted with the accuser's descriptions of appellant's office locations and interior furnishings.

{¶ 48} With respect to the charges involving L.M., the jury returned guilty verdicts on Count 10 of the indictment (rape), Count 14 of the indictment (kidnapping), and Counts 15, 16, 17, and 18 of the indictment (sexual battery). The court merged Counts 15 and 10 of the indictment for sentencing purposes, and the prosecution elected to sentence on Count 10 of the indictment for rape. The court declined to merge any other counts involving L.M., in particular, finding that the rape and kidnapping counts, although arising out of the same transaction, were driven by a separate animus.

{¶ 49} The jury returned a guilty verdict on Count 2, public indecency, involving C.C. The trial court addressed this in a separate misdemeanor sentencing entry imposing 30 days jail time with full credit for time served.

{¶ 50} The jury returned a guilty verdict on Count 3 of the indictment (gross sexual imposition) involving C.C. The jury also returned a guilty verdict on Count 8 of the indictment (gross sexual imposition) involving K.R.

{¶ 51} The court imposed sentences of 15 months on Count 3 of the indictment, 15 months on Count 8 of the indictment, 9 years on Count 10 of the indictment, 4 years on Count 14 of the indictment, and 30 months each on Count 16, 17, and 18 of the indictment. The terms for Counts 3 and 8 of the indictment were to be served concurrently with each other and with Counts 10 and 14 of the indictment. Terms for Counts 10 and 14 were consecutive to each other but concurrent to Counts 16, 17, and 18, themselves concurrent with each other, for a total sentence of 13 years.

{¶ 52} The trial court entered sentence on August 28, 2014. Appellant filed his notice of appeal with this court on August 29, 2014. On August 7, 2015, appellant filed a motion for a new trial. On July 9 and 10, 2015, the court transmitted the transcript and record, respectively, in the criminal case to this court. On April 5, 2016, the trial court denied appellant's motion for leave to file his motion for a new trial. Appellant attempted to appeal the trial court's denial of his motion for leave to move for a new trial and, on

May 24, 2016, we dismissed that appeal as untimely. *State v. Armengau*, 10th Dist. No. 16AP-355 (May 24, 2016) (journal entry of dismissal).

## III. APPELLANT'S APPEAL

{¶ 53} Appellant's direct appeal has now been fully briefed. Appellant brings the following nine assignments of error:

> [I.] The trial court erred in permitting the amendment of the indictment and bill of particulars, which even after amendment remained duplicative and lacked the requisite specificity. That error, along with the State's own confusion regarding the relevant conduct underlying these counts, resulted in violations to Mr. Amengau's rights to due process of law, a fair trial, jury unanimity, and the double jeopardy protections to which he was entitled. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution; Crim.R. 31(A).

> [II.] Mr. Armengau's rights to due process and a fair trial were violated when the trial court allowed the State to present irrelevant, cumulative, overly prejudicial evidence about prior bad acts through additional non-victim witnesses, whose testimony also violated the Ohio Rape Shield Statute, as well as testimony of hundreds of unindicted offenses.

> [III.] The trial court erred when it imposed separate sentences for offenses that arose from the same conduct, were not committed separately or with a separate animus, had a similar import, and should have been merged for sentencing purposes under R.C. 2941.25.

> [IV.] The prosecutors' misconduct denied Mr. Armengau a fair trial and due process of law, in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, Article I, Sections 10 and 16, of the Ohio Constitution, and R.C. 2901.05.

> [V.] Javier Armengau was deprived of his constitutional right to the effective assistance of counsel. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Section 10 and 16, Ohio Constitution.

> [VI.] The trial court erred in denying Javier Armengau's Crim.R. 29 motion for acquittal, and violated his rights to

due process and a fair trial when, in the absence of sufficient evidence, it convicted him of counts 8, 10, 14, 15, 17, and 18.

[VII.] The trial court erred in denying Javier Armengau's Crim.R. 29 motion for acquittal, and violated his rights to due process and a fair trial when, in the absence of sufficient evidence, it convicted him of counts 3 and 8.

[VIII.] The trial court violated Javier Armengau's constitutional right to be free from retroactive laws.

[IX.] The trial court violated Javier Armengau's right to due process and a fair trial through cumulative error.

## A. The Indictment and Bill of Particulars

{¶ 54} Appellant's first assignment of error raises multiple issues relating to the charges involving L.M. Appellant first asserts that the trial court erred in allowing the state to amend the indictment and bill of particulars. He also asserts that the trial court allowed the state to try him for unindicted offenses. Finally, he asserts that the indictment and bill of particulars lacked specificity to differentiate duplicative offenses involving L.M., and the result was a patchwork verdict that did not reflect the jury unanimity required by Crim.R. 31(A). Appellant asserts that the trial court erred in denying a mistrial based on these errors, and that he was deprived of his due process rights under the Fifth, Sixth, and Fourteenth Amendments, United States Constitution, and Article I, Sections 10 and 16, Ohio Constitution.

{¶ 55} Article 1, Section 10 of the Ohio Constitution provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury." This language "guarantees the accused that the essential facts constituting the offense for which he is tried will be found in the indictment of the grand jury." *State v. Headley*, 6 Ohio St.3d 475, 478 (1983). The state is entitled to state a count in the indictment in bare statutory language. Crim.R. 7(B). A defendant seeking to clarify the facts of the criminal allegations contained within the indictment may request a bill of particulars "setting up specifically the nature of the offense charge and of the conduct of the defendant alleged to constitute the offense." Crim.R. 7(E). The purpose of the bill of particulars is to "elucidate or particularize the conduct of the accused alleged to constitute

the charged offense." *State v. Sellards*, 17 Ohio St.3d 169, 171 (1985). However, "[a] bill of particulars is not designed to provide the accused with specifications of evidence or to serve as a substitute for discovery." *Id.*

### 1. The L.M. Charges and Amendments

{¶ 56} Appellant points out that the charges with respect to L.M. varied between the bill of particulars, the amended bill of particulars, and yet again with L.M.'s testimony. For all offenses, the time frame shifted: 2002 to 2008 inclusive in the indictment, 1999 to 2008 inclusive after amendment of the indictment at trial, and between 1998 and 2003 according to L.M.'s testimony.

{¶ 57} The other particulars of the offenses varied as well. For example, as indicted, Count 9 alleged vaginal rape. The first bill of particulars described this as occurring on the couch in appellant's Marion office, with the door locked and appellant's hands in L.M's mouth to silence her. The first and second amended bills of particulars did not alter this description. When opposing the defense's Crim.R. 29 motion for acquittal at the close of the state's case, the state, lacking any testimony from L.M. concerning rape under these circumstances, argued that this offense now rested on L.M.'s description of a possible drugging rape occurring in appellant's Marion office, the first incident she endured. The state's closing statements maintained this theory, in direct contradiction to the state's comments in opening statements, which represented the drugging incident as an unindicted offense. (Tr. at 1463-69, 2355-56.) Based on those transformations, appellant now asserts that he ultimately was tried (albeit acquitted) for the crime of rape through induced intoxication, R.C. 2907.02(A)(1)(a), when the indictment charged rape through submission by force or threat of force, R.C. 2907.02(A)(2).

{¶ 58} Similarly, Count 10 of the indictment alleged oral rape, and the conduct supporting this shifted over the course of trial. The initial bill of particulars did not provide details for this offense. The second amended bill of particulars specified that appellant "did force [L.M.] to have oral sex with him in his Marion office by telling her to 'do it' and forcing his penis into her mouth." (June 22, 2014 Second Amended Bill of Particulars at 2).

{¶ 59} Finally, Count 14 of the indictment alleged kidnapping with purpose to engage in sexual activity. The first bill of particulars tied this conduct to an office couch

rape involving a locked door and appellant's hand in the victim's mouth to silence her; after the various amendments to the bills of particulars regarding the three original counts of vaginal rape (Counts 9, 12, and 13) in the indictment, this conduct matches only Count 9. (The second amended bill of particulars described Counts 12 and 13 to conform to L.M.'s testimony of rapes in a white truck.) The second amended bill of particulars further altered the facts so that the kidnapping in Count 14 now alleged restraint of liberty in furtherance of compelled oral sex, thus detaching Count 14 from the vaginal rape in Count 9 and attaching it to one of the two oral rape counts, either Count 10 or 11.

{¶ 60} There is no doubt that the evidence heard at trial forced a steady evolution of the state's theory of the case for the offenses involving L.M. However, the law, in the form of Crim.R. 7(D), contemplates that this circumstance will arise in many criminal cases and the state will not be irremediably bound to the facts available at the outset of trial: the state may amend the indictment and bill of particulars so long as "no change is made in the name or identity of the crime charged." Crim.R. 7(D); *State v. White*, 10th Dist. No. 06AP-607, 2007-Ohio-3217, ¶ 17. And even in cases where the state has not amended the bill of particulars, "Crim.R. 33(E)(2) states that a verdict shall not be set aside, nor shall any judgment of conviction be reversed because of a variance between the allegations and the proof unless the defendant is misled or prejudiced by the variance." *State v. Kersey*, 124 Ohio App.3d 513, 518 (1st Dist.1997).

{¶ 61} Ultimately, the initial lack of specificity and the court's allowance of serial amendments did not materially prejudice appellant. Apart from the dates of the offenses, which remained imprecise, the charges against appellant were sufficiently specific to allow an effective defense, which ultimately was successful as to certain charges. With respect to the variations in dates, appellant's defense did not rely on alibis or impossibility for the open dates given in the indictment, and "[t]he precise date and time a rape occurs is not an essential element of the crime." *State v. Reinhardt*, 10th Dist. No. 04AP-116, 2004-Ohio-6443, ¶ 20, citing *State v. Madden*, 15 Ohio App.3d 130 (12th Dist.1984). Appellant's defense relied on absolute denial of any sexual activity with L.M. outside of a two-week consensual dating relationship whose timing did not impact the charged crimes. The jury found appellant not guilty of rape by induced intoxication under Count 9, the alleged

unindicted offense. Appellant cannot suggest prejudice from the lack of specificity in the bill of particulars or the later amendments.

### 2. Jury Unanimity

{¶ 62} Finally, appellant argues that the complex, and allegedly mismatched, assemblage of facts, testimony, indictment, and amendments of the bill of particulars allowed the jury to produce a "patchwork" verdict in violation of Ohio's requirement of jury unanimity, under Crim.R. 31(A). Pursuant to that rule, jurors must unanimously agree not only on the defendant's guilt, but as to proof as to each element of the crime. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 37. While unanimity is not required on the *manner* in which each element is satisfied in an "alternative means" case, the distinction must be made between "alternative means" cases and "multiple acts" cases. *Id.* at ¶ 48-51. Appellant argues that both the state's tactics and the court's jury instructions invited a less-than-unanimous verdict.

{¶ 63} In alternative-means cases, an offense may be committed in more than one way and jury unanimity is required for the crime itself but not the means by which it was committed. *Gardner* at ¶ 49. In multiple-acts cases, several different acts can constitute the charged crime, and jury unanimity is required as to which act or incident supports the crime. *Id.* at ¶ 50. In a multiple-acts case, the jury must be unanimous as to which act or incident constitutes the crime. To ensure this, the state must specify the particular criminal act upon which it relies for conviction, and the trial court must "instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Id.* It follows that in a case where multiple crimes are charged, the jury must unanimously agree on which underlying criminal act supports any given charge.

{¶ 64} Here, appellant's counsel requested a jury instruction expressly advising the jury to consider each count separately, uninfluenced by their conclusion as to any other count. This was not given. The state requested an alternative-means instruction, which was given. The court then advised the jury only in general terms regarding unanimity, without elaborating on the need to consider the counts independently: "Before you can find the defendant guilty, you must unanimously agree on your verdict." (Tr. at 3830.) Because counsel did not object to the jury instructions as given, we review the issue under a plain-error standard. *State v. Hartman*, 93 Ohio St.3d 274, 289 (2001). Plain error

exists where the outcome of the trial would clearly have been different but for the error. Crim.R. 52(B); *State v. Biros*, 78 Ohio St.3d 426, 431 (1997); *State v. Long*, 53 Ohio St.2d 91, 97 (1978). The plain error rule must be applied with the utmost caution and invoked only under exceptional circumstances to prevent a manifest miscarriage of justice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 62; *State v. Cooperrider*, 4 Ohio St.3d 226, 227 (1983).

{¶ 65} Appellant argues that his case is a multiple-acts case, not an alternative-means case, and that the state improperly led the jury to believe that various acts, occurring in different places and at different times, could support conviction for a given count as long as jurors all agreed that *some* of the acts had been committed, although not necessarily agreeing as to which ones. Because L.M. testified, not only as to specifics, but as to continuous sexual conduct occurring on at least a weekly basis over a period of years, he asserts that it becomes impossible to ascertain which aspect of the testimony the jury unanimously relied upon to convict for any particular criminal count.

{¶ 66} The jury verdict reflects, to the contrary, that the jury was able to clearly differentiate the various specifics supporting each offense. L.M.'s general testimony of ongoing and continual abuse does not compel the conclusion that the jury confused the various specific incidents she described. These included four specific incidents of vaginal or oral rape and an incident of compelled fellatio in her Dublin apartment in which appellant made L.M. lock her young child away in another room. L.M.'s testimony was sufficiently precise in describing the major incidents outlined above. While we, of course, do not take the blanket position that a partial acquittal disproves all error, in this case, under a plain error standard, the fact that the jury refused to convict on some of these counts even while returning a guilty verdict on the others tends to refute the possibility of a patchwork verdict. We find that the outcome of the case would not have been clearly different had the requested instruction been given or the counts particularized more consistently in the course of prosecution.

{¶ 67} In summary, we conclude that appellant was not deprived of his constitutional due process rights by the form of the indictment, the subsequent amendment thereof, the form of the bill of particulars through multiple amendments, and

the jury instructions provided by the court. We overrule appellant's first assignment of error.

## B. The Admission of Other-Acts Testimony

{¶ 68} Appellant's second assignment of error asserts that the trial court prejudicially erred when it permitted the state to present, over objection, quantities of prior-bad-acts evidence. This consisted of the testimony of the other-acts witnesses, two of whom described appellant's conduct in the form of consensual sexual relationships with clients, and testimony by the accusers, who were allowed to describe related but unindicted acts. Appellant asserts that the sheer volume of such evidence demonstrates that the state's case was strategically premised on improper evidence regarding his propensity to commit the alleged offenses.

### 1. Legal Standards

{¶ 69} Evidence of other acts of the defendant, different from those for which the defendant is on trial, is generally not admissible when the purpose is to show the defendant's character, or propensity to commit crime. Evid.R. 404(B); R.C. 2945.59; *State v. Curry*, 43 Ohio St.2d 66 (1975); *State v. DeMarco*, 31 Ohio St.3d 191 (1987). Because the much more recent rules of evidence essentially supplanted the earlier statute but reflect the same common-law exclusion, the Supreme Court of Ohio has clarified that the underlying policies of Evid.R. 404(B) and R.C. 2945.59 are essentially the same, and that the provisions should be read in conjunction with each other. *State v. Broom*, 40 Ohio St.3d 277, 281 (1988); *see also State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 67 (12th Dist.). The policies underlying the limited admissibility of other-acts evidence include the inherent danger that the jury will convict because the defendant is crime-prone, the injustice of forcing a defendant to defend against evidence the defendant is not prepared to challenge, and the resulting confusion of the issues. *Curry* at 68.

{¶ 70} Such evidence may, however, be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, the Supreme Court set out a three-step analysis for the trial court to consider in admitting "other acts" evidence: (1) whether the other-acts evidence is relevant under Evid.R. 401, (2) whether the other-acts evidence is presented for a permissible purpose,

such as those stated in Evid.R. 404(B), rather than to prove the character of the accused in order to show activity in conformity therewith, and (3) whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice under Evid.R. 403. *Id.* at ¶ 19-20.

{¶ 71} "[T]rial court decisions regarding the admissibility of other-acts evidence under Evid.R. 404(B) are evidentiary determinations that rest within the sound discretion of the trial court. Appeals of such decisions are considered by an appellate court under an abuse-of-discretion standard of review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 22. Although the term "abuse of discretion" is often defined, pursuant to *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983), as an unreasonable, arbitrary, or unconscionable decision, no court has the authority, within its discretion, to commit a prejudicial error of law. *State v. Moncrief*, 10th Dist. No. 13AP-391, 2013-Ohio-4571, ¶ 7, *State v. Easley*, 10th Dist. No. 16AP-9, 2016-Ohio-7271, ¶ 6.

{¶ 72} Appellant objected at trial to much of this testimony. The trial court, in addressing objections to the three other-acts witnesses who did not testify as to indicted crimes, accepted the state's explanation of relevancy and Evid.R. 404(B) admissibility. The court ruled that their testimony was admissible to establish motive and method, describing appellant's alleged practice of "grooming" vulnerable clients for eventual exploitation. Over separate objections, the court similarly allowed A.C. and L.M. to testify in the most general terms that appellant demanded sexual compliance on a regular basis over many years. This testimony wove a pattern of numerous instances of express or implied sexual conduct that did not specifically underlie any indicted offenses. The court issued limiting instructions to the jury at two points in the trial, instructing the jury to consider the other-acts evidence, not as proof of character and tendency to act in conformity therewith, but solely as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Tr. at 1443, 3800.)

### 2. Legal Analysis

{¶ 73} The first step under *Williams* asks whether the evidence is relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Irrelevant evidence is

inadmissible, while relevant evidence is generally admissible subject to certain exceptions. Evid.R. 402.

{¶ 74} Appellant argues that evidence of consensual relationships with some witnesses, and improper comments to another, is irrelevant to prove the existence of coerced or forcible sexual conduct towards the accusers. He also asserts that testimony by the accusers themselves exceeded the scope of charged crimes and included many instances of alleged but uncharged sexual assaults. On both aspects, the evidence was sufficiently probative to support the court's ruling of admissibility. Evidence of consensual sexual activity with clients is not so remote from the charged crimes. While appellant understandably stresses that consensual sex is fundamentally distinguishable from coerced or forced sex, sexual activity with clients, particularly clients similarly situated to those who were the objects of the charged crimes, is a common thread that supports relevance. Similarly, evidence of uncharged but similar crimes may be admissible if they establish plan or method of operation. *See generally State v. Perez*, 124 Ohio St.3d 122, ¶ 98-102 (Evidence of uncharged robberies not resulting in injuries to victims was admissible in aggravated murder trial arising from armed robbery and shooting.).

{¶ 75} The second question asked in *Williams* assesses whether the state offered the evidence under a permissible exception defined in Evid.R. 404(B). This distinction frequently, as here, turns on whether the evidence served only to offer a description of character and tendency to act in conformity therewith, or to the contrary was permissible evidence of a scheme, plan, or system. The line is often blurred, *see, e.g.*, *Perez* at ¶ 98-104, but in the context of this case the trial court had discretion to admit the disputed evidence for the reasons described above. In fact, the case here is nearly on all fours with *Williams*, as the holding in that case shows: "Evidence that Williams had targeted teenage males who had no father figure to gain their trust and confidence and groom them for sexual activity with the intent of sexual gratification may be admitted to show the plan of the accused and the intent for sexual gratification." *Williams* at ¶ 25.

{¶ 76} The third step in *Williams* asks whether the probative value of the evidence is outweighed by the danger of unfair prejudice. We find that it does not on the present facts. The court twice gave a limiting instruction to the jury, and the jury is presumed to follow the trial court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 75 (1994).

{¶ 77} Moreover, even if the evidence were improperly admitted, we would find no prejudicial error on this record. "In determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, syllabus. "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." *Id.* at ¶ 32; *see also Columbus v. Phillips*, 10th Dist. No. 15AP-408, 2015-Ohio-5088, ¶ 40. The evidence on the crimes for which the jury returned a verdict was considerable, if believed, and the jury's decision to reject some counts as to certain accusers, and all counts as to others, again indicates that the jury did not allow the contested evidence to taint the overall verdict.

{¶ 78} In addition to the obstacles to introduction of other-acts evidence under the rules of evidence, appellant asserts that admission of his past sexual activity violates R.C. 2907.02(D) and 2907.05(E), which govern the introduction of evidence pertaining to the sexual history of either the victim or defendant in sex offense cases. Although the statutes are identically worded, R.C. 2907.02(D) applies to rape prosecutions, and R.C. 2907.05(E) applies to gross sexual imposition prosecutions. The statutes are commonly referred to as "Ohio's rape shield laws." *In re M.C.*, 10th Dist. No. 12AP-618, 2013-Ohio-2109, ¶ 59. Their wording is identical with respect to evidence of the defendant's past sexual activity:

> Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

R.C. 2907.02(D); 2907.05(E).

{¶ 79} The rape shield law creates a presumption that past sexual conduct by a defendant or victim may not be admitted, but by its own language this exclusion is subject to the same exceptions as any other evidence under Evid.R. 404(B) and R.C. 2945.59. For the reasons given in our discussion of Evid.R. 404(B) above, the admission of evidence regarding appellant's past sexual conduct did not violate the rape shield law.

### 3. Conclusion

{¶ 80} In summary, the admission of other-acts evidence did not constitute reversible error in this case on any of the bases argued by appellant, and appellant's second assignment of error is overruled.

### C. Prosecutorial Misconduct

{¶ 81} Reserving appellant's third assignment of error for later discussion, we next address appellant's fourth assignment of error. This asserts that prosecutorial misconduct denied appellant his right to a fair trial and due process of law under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Ohio Constitution, Article I, Sections 10 and 16. In reviewing a claim of prosecutorial misconduct, we inquire first whether the prosecution's statements or actions were improper, and, if so, whether they prejudiced the defendant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). Otherwise stated, a prosecuting attorney's conduct during a trial does not constitute grounds for error unless the conduct deprived the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405 (1993). *See also Smith v. Phillips*, 455 U.S. 209 (1982) ("the touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). The effect of the prosecutor's misconduct must be considered in light of the whole trial. *State v. Durr*, 58 Ohio St.3d 86, 94 (1991).

{¶ 82} In this case, defense counsel did not object at trial to most of the alleged misconduct described on appeal. We therefore review those aspects under a plain error standard, and will not find plain error on appeal unless the outcome of the trial, but for the error, clearly would have been different. Crim.R. 52(B); *Biros, supra; Long, supra.*

### 1. The "Doctrine of Chances"

{¶ 83} The improper conduct cited by appellant concerns the prosecutor's misinterpretation and reliance on a rarely invoked legal theory known as the "doctrine of

chances," telling the jury that under this theory they could conclude that cumulative testimony as to multiple criminal acts would be probative, on the basis of sheer probability, as to the occurrence of at least some of the acts. At closing, for example, the prosecution repeatedly asked the jury "what are the odds?" (Tr. at 3756.) "[W]hen is this no longer a coincidence, but the truth?" (Tr. at 3757.) "Again what are the odds, and when does this stop being a coincidence and being the real thing?" (Tr. at 3758.) The prosecution summed up closing by saying, "[n]ow that's the doctrine of chances and this case is a classic example of it." (Tr. at 3758.) No objection was made to these comments.

{¶ 84} Appellant argues that the continual misstatement and misapplication of the doctrine of chances allowed the prosecution in the course of closing to continuously circumvent any prior limitation on the use of other-acts evidence, essentially nullifying any cautions issued by the court during testimony or contained in the jury instructions. The prosecution, appellant contends, repeatedly told the jury in closing that the doctrine of chances allowed the jury to infer a "behavioral fingerprint" that established his guilt in specifically charged offenses based upon his general conduct across all circumstances: "[I]n this case they don't stand alone because the defendant's fingerprints are all over their crime scenes. He has left a behavioral fingerprint stronger than any bloodstain, stronger than any fiber the state could produce for you. That behavioral fingerprint is his modus operandi, his MO." (Tr. at 3636.)

{¶ 85} We agree with appellant that the state both misstated the doctrine of chances and asked the jury to misapply it to the evidence. The doctrine does not call for the jury to apply the laws of probability in the manner invoked by the state here. Instead, the doctrine, to the extent that it has been applied (and only rarely) in Ohio, goes to mens rea and intent, when the defendant has *admitted* to certain conduct but defended on the basis of innocent purpose or accidental involvement. For this purpose, the state may present evidence of the frequency with which the defendant unaccountably blundered into a criminal context: "Uncharged misconduct evidence is admissible to prove guilty knowledge and disprove any assertion of being 'merely present' or an 'innocent dupe.' Imwinkelried, *Uncharged, Misconduct Evidence* (1992) 51, Section 5:25. This is known as the doctrine of chances." *State v. Wright*, 4th Dist. No. 00CA39 (Dec. 6, 2001), fn. 7. Sometimes invoked to argue for the admission of evidence that might be excluded on

grounds of relevancy under Evid.R. 403, the rule does not offer blanket exception to relevance and other-acts restrictions, nor can such evidence be invoked to "tempt the jury to decide the case on an improper basis." *State v. McDaniels*, 4th Dist. No. CA487 (Nov. 9, 1993).

{¶ 86} Although the state clearly misstated and improperly applied the doctrine of chances here, under a plain error standard we can discern no grounds for reversal. The verdicts indicate that the jury rejected the invitation to blend testimony regarding one offense into its determination regarding another, and remained willing to consider each accuser's testimony on its own merits as each offense, reaching an independent conclusion on the various charges. There is no basis to conclude that, but for the state's comments in this respect, the outcome of the trial would clearly have differed.

### 2. Closing Aruguments

{¶ 87} Also in connection with the state's closing statement, appellant argues on appeal that the prosecution improperly expressed the belief that appellant had lied and that his defense witnesses had lied on the stand. The attacks on appellant's veracity were also combined with application of the supposed doctrine of chances: "[I]f that case is legit, and I suggest to you that it is overwhelmingly, then they're all legit, because of the doctrine of chances and because everything that he's told you in this courtroom is a lie." (Tr. at 3770.)

{¶ 88} "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). "It is improper for a prosecutor to state that the defendant is a liar or that [the prosecutor] believes that the defendant is lying. *State v. Baldev*, 12th Dist. No. CA2004-05-106, 2005-Ohio-2369, ¶ 20, citing *State v. Rahman*, 23 Ohio St.3d 146, 154 (1986). In *Rahman*, the prosecutor characterized the defendant during closing as "the biggest liar that's taken the stand in a long time." *Id.* at 154. *Rahman* was in part based on the Supreme Court's application of the former Ohio Code of Professional Responsibility, which barred comments by an attorney or prosecutor expressing a personal opinion as to credibility of a witness. The current language of the Ohio Rules of Professional Conduct, which has replaced the former Ohio Code of Professional Responsibility, maintained that prohibition at Prof.Cond.R. 3.4(E).

{¶ 89} While appellant points to a number of statements that are allegedly improper in this respect, most are not objectionable when taken in context. Three comments by the state in closing arguments, however, merit specific discussion.

{¶ 90} In the first, appellant points to the prosecutor's purported endorsement of L.M.'s credibility. Appellant argues that the state improperly vouched for the credibility of L.M. by stating in closing, "I can't imagine how hard it would be to sit there and respond to cross-examination and make up stories and lies when you can't even speak the [English] language." (Tr. at 3757.) This remark, taken in context, amounted to an improper assertion of personal opinion regarding the witness's credibility.

{¶ 91} The second and third comments regarding credibility also present serious problems. The prosecutor's above-quoted comment "everything that he's told you in this courtroom is a lie" was blatantly improper under *Williams*, 79 Oho St.3d 321, and *Rahman*. Likewise, the prosecutor improperly referred to "fraud" when referring to certain evidence describing appellant's prior disciplinary reprimand arising from his conduct as an attorney in his practice. The prosecutor took the opportunity to state that appellant's conduct in the disciplinary case "was perpetrating a fraud like he did [when testifying] Friday and Monday in here." (Tr. at 3772.) The fraud comment was also blatantly improper under *Williams*, 79 Ohio St.3d 321, and *Rahman*.

{¶ 92} Examining these improper statements by the prosecutor in light of the whole trial, and focusing on the fairness of that trial, we conclude that they did not prejudice appellant's substantial rights. *Durr; Treesh; Keenan, supra*. Given the volume of evidence presented on the various points, the jury's rejection of much of the testimony that was allegedly bolstered by the prosecution's remarks, and appellant's own contradictory remarks during testimony, we again cannot conclude that expressed prosecutorial opinions regarding the credibility of witnesses deprived appellant of a fair trial .

{¶ 93} Finally, we note appellant's objection to the prosecutor's use of the term "prey" repeatedly during closing when referring to the accusers in the case. We find that "[w]hile certainly vivid, the words are not inflammatory or improper in the contexts quoted." *State v. Scharf*, 6th Dist. No. OT-01-010 (Nov. 9, 2001). Appellant also objects to remarks concerning appellant's expressed belief that he was the object of a conspiracy

between the county prosecutor, the attorney general's office, and the police. In closing, the prosecutor dismissively told the jury that she expected that appellant would have everyone in the courtroom wearing "tinfoil hats, and the defendant was going to produce the second shooter from the grassy knoll." (Tr. at 3644.) Again, while the prosecution succeeded in casting appellant's suspicions in colloquial terms invoking a crackpot conspiracy theory, vivid language is not necessarily improper language, and this did not constitute misconduct, particularly when we consider the closing arguments in their entirety to assess prejudice. *See generally State v. Moritz*, 63 Ohio St.2d 150, 157 (1980).

### 3. Conclusion

{¶ 94} In summary, reference to the doctrine of chances was improper in this case because the prosecutor incorrectly presented this doctrine as a call to consider cumulative propensity evidence as probative. We clarify that the doctrine does not operate in derogation of Ohio's well-established rules against the improper use of other-acts evidence. The evidence in question, however, was properly admitted to show motive, opportunity, intent, or a pattern of conduct. The prosecution's language verged on the excessive but did not cross the line with reference to the use of terms "prey," "tinfoil hats," and "grassy knoll shooter," and we do not find error in this particular terminology. Finally, if at least three of the prosecution's remarks concerning veracity of witness testimony were improper, we find no impairment of appellant's substantial rights, given the volume of evidence presented on the various points and the jury's rejection of much of the testimony that was allegedly bolstered by the prosecution's remarks. Appellant's fourth assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶ 95} Appellant's fifth assignment of error asserts that errors committed by his counsel at trial deprived him of his constitutional right to effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16, Ohio Constitution. To establish a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of

counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.") In order to show that trial counsel's performance was deficient, the defendant must prove that counsel's performance fell below an objective standard of reasonable representation. *Jackson* at ¶ 133. The defendant must overcome the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland* at 689. To show prejudice, the defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 204.

### 1.  Failure to Request Severance of Charges

{¶ 96}  The basis for appellant's claim of ineffective assistance of trial counsel is trial counsel's failure to move pretrial to sever the charges in relation to each victim. Appellant argues that, had trial been severed for the different victims, the cumulative and duplicative evidence that aided his conviction would not have been heard by the jury.  This proposition is founded on the assumption that each victim would have been limited to testifying in her own trial, the other-acts witnesses would not have been heard, and thus each juror would have heard a far lesser volume of evidence regarding appellant's other acts.

{¶ 97}  Crim.R. 14 governs severance in a criminal matter:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires.

{¶ 98}  Joinder, presenting the equal and opposite proposition, is governed by Crim.R. 8(A):

> Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or

> misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶ 99} "Joinder is liberally permitted to conserve judicial resources, reduce the chance of in incongruous results and excessive trials, and diminish inconvenience to witnesses. *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992), citing *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). Nonetheless, the Supreme Court acknowledged in the same discussion that joinder of offenses of the same or similar character "creates a greater risk of prejudice to the defendant," especially where the benefits from consolidation are reduced because the otherwise-unrelated offenses involved different times, locations, victims, and witnesses. *Schaim* at 58, fn. 6. In determining whether the offenses are best joined or tried separately, the court must consider first, whether the evidence of the other crimes would be admissible if the counts were severed, and, secondly, whether the evidence of each crime is distinct and specific to that crime. *Schaim* at 59, citing *State v. Hamblin*, 37 Ohio St.3d 153, 158-59 (1988), and *Drew v. United States*, 331 F.2d 85, 91 (D.C.Cir.1964).

{¶ 100} When the allegations of ineffective assistance are based on trial counsel's failure to file a motion for severance or to oppose joinder, the defendant must show that (1) the motion was meritorious or likely to be granted, and (2) that there was a reasonable probability that the verdict would have been different had the motion been made. *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 63 (failure to oppose joinder did not support ineffective assistance claim), citing *State v. Santana*, 90 Ohio St.3d 513 (2001), and *State v. Lott*, 51 Ohio St.3d 160 (1990).

{¶ 101} The first consideration here is that there is no sound reason to believe that the trial court would have granted a motion to sever under the considerations set forth by the Supreme Court in *Schaim*. Furthermore, as we determined above, the trial court did not err in admitting the testimony of witnesses who were not the object of unindicted crimes. It is not immediately apparent, therefore, that testimony of witnesses who had been the victims of indicted crimes would not have been presented, along with those other "other acts" witnesses, had trial been severed as to the counts against each victim.

{¶ 102} Moreover, counsel's strategy in refusing to request severance may have been founded, first, on the likelihood that each victim's testimony would actually have been persuasive in its own right, and the risk associated with multiple trials outweighed the benefits of isolating the testimony for a given victim. Second, trial counsel could have considered that the cumulative lack of credibility from all the accusers might outweigh the cumulative impact of testimony, an assessment that seems at least partly fulfilled by the ultimate verdicts.

### 2. Conclusion

{¶ 103} We find that the outcome of the trial would not clearly have been different had counsel moved to sever the claims. There is no guarantee that the trial court would have allowed severance, and insufficient reason to believe that the outcome would have been different as to each accuser had the cases been tried separately. *See generally State v. Dantzler*, 10th Dist. No. 14AP-907, 2015-Ohio-3641. Appellant's fifth assignment of error is accordingly overruled.

### E. Venue

{¶ 104} Appellant's sixth assignment of error asserts that appellant's convictions under Counts 8, 10, 14, 15, 17, and 18 of the indictment must be reversed because the state failed to present evidence to support venue for those crimes as charged in the indictment, and the trial court accordingly erred in denying appellant's Crim.R. 29 motion made after the state rested. We disagree.

{¶ 105} Under Crim.R. 29(A), a court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Because a Crim.R. 29 motion questions the sufficiency of the evidence, "[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence." *State v. Hernandez*, 10th Dist. No. 09AP-125, 2009-Ohio-5128, ¶ 6; *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37; *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 16. "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the

evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*; *see also State v. Neil*, 10th Dist. No. 14AP-981, 2016-Ohio-4762, ¶ 94; *State v. Crosky*, 10th Dist. No. 06AP-655, 2008-Ohio-145, ¶ 43.

### 1. Legal Standards

{¶ 106} Venue commonly refers to the appropriate place of trial for a criminal prosecution within a state. "[J]urisdiction and venue are not the same, as the former denotes the power of the court to hear the case and the latter denotes the situs of trial." *State v. Giffin*, 62 Ohio App.3d 396, 403 (10th Dist.1991), citing *State v. Loucks*, 28 Ohio App.2d 77 (4th Dist.1971). Proper venue insures that "the state [does not] indiscriminately [seek] a favorable location for trial or [select] a site that might be an inconvenience or disadvantage to the defendant." *State v. Meridy*, 12th Dist. No. CA2003-11-091, 2005-Ohio-241, ¶ 12, quoting *State v. Gentry*, 61 Ohio Misc.2d 31, 34 (1990). The fact that venue is not a restriction on territorial jurisdiction is underscored by the provisions of Crim. R. 18(B) and R.C. 2901.12(K), which provide for a change of venue if the trial court finds that a fair and impartial jury cannot be seated in the court where the action is pending.

{¶ 107} Because venue is neither a jurisdictional nor a material element of a criminal offense, the indictment is only required to contain an allegation that the offense was committed within the jurisdiction of the court. *State v. Andrews*, 148 Ohio App.3d 92 (10th Dist.2002). Even when multiple offenses are alleged in an indictment, an indictment is not rendered invalid where the "place has been stated once therein." *State v. Williams*, 53 Ohio App.3d 1 (10th Dist.1988). While venue is not a material element of the offense as charged, it is a fact that the state must prove beyond a reasonable doubt unless waived by a criminal defendant. *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, ¶ 22; *State v. Birt*, 12th Dist. No. CA2012-02-031, 2013-Ohio-1379, ¶ 27. "Venue need not be proven in express terms; it may be established either directly or indirectly by all the

facts and circumstances of the case." *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 144.

{¶ 108} The indictment in the present case alleged for each count that the criminal conduct occurred "within the county of Franklin." (May 20, 2013 Indictment, Counts 1 through 18.) Appellant argues that for all but three of the counts for which he was convicted, the state failed to prove venue because it introduced no evidence at all that the crimes occurred in Franklin County: for Counts 8 (gross sexual imposition, K.R.), 10 (rape, L.M.), 14 (kidnapping, L.M.), and 15, 17, and 18 (sexual battery, L.M.), the only evidence heard placed the offenses in Marion County. In contrast, for Counts 2 and 3 (public indecency and gross sexual imposition, C.C.), and Count 16 (sexual battery, L.M.), appellant concedes on appeal that the evidence supported venue in Franklin County. At the close of the state's case, the defense moved, unsuccessfully, for a Crim.R. 29 acquittal for those incidents for which the evidence established the location as Marion County. Appellant argues that the trial court erred when it denied his Crim.R. 29 motion.

{¶ 109} The state responds that any deficiency in the indictment was cured by subsequent amendment of either the indictment or the bill of particulars. We disagree. It is the language of the indictment that defines the venue for which the state bears the burden of proof. *Hampton, supra*, at ¶ 23. As stated above, the original indictment specified Franklin County as venue for all crimes. The state never amended the venue allegation in the indictment. Therefore, the state had to prove that venue was proper in Franklin County.

{¶ 110} The state also argues that all crimes took place as part of a course of criminal conduct across several jurisdictions, including Franklin County, establishing venue in Franklin County under the course of criminal conduct terms of R.C. 2901.12(H). We conclude that the state presented sufficient evidence to prove venue under the course of criminal conduct provisions in R.C. 2901.12(H).

### 2. Venue and Course of Criminal Conduct–R.C. 2901.12(H)

{¶ 111} When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses

occurred. R.C. 2901.12(H). To establish a course of criminal conduct, the statute provides in relevant part:

> (H) * * * Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
> (1) The offenses involved the same victim, or victims of the same type or from the same group.
>
> (2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.
>
> (3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.
>
> (4) The offenses were committed in furtherance of the same conspiracy.
>
> (5) The offenses involved the same or a similar modus operandi.
>
> (6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

R.C. 2901.12(H).

{¶ 112} "R.C. 2901.12(G) and (H) are statutory reflections of the modern mobility of criminals to perform unlawful deeds over vast geographical boundaries." *State v. Draggo*, 65 Ohio St.2d 88, 90 (1981). Consistent with this multi-county venue, "a grand jury of one county has authority to indict on offenses occurring in other counties provided that those offenses are part of a course of criminal conduct." *State v. Ahmed*, 8th Dist. No. 84220, 2005-Ohio-2999, ¶ 11. The Supreme Court of Ohio confirmed the law as stated in *Ahmed* when it decided *Jackson* at ¶ 131:

> There is no constitutional or statutory provision that prohibited the Cuyahoga County Grand Jury from indicting Jackson for offenses that occurred in Erie and Lorain Counties as part of a course of criminal conduct that included crimes within Cuyahoga County. R.C. 2901.11 and 2901.12 permit a grand jury to indict an offender for offenses that

occurred outside the county, provided that the offenses are part of the same course of criminal conduct that took place in the county in which the grand jury resides.

{¶ 113} The present case involves a series of offenses that fit four of the criteria enumerated in R.C. 2901.12(H). The victims were "of the same type, or from the same group" under R.C. 2901.12(H)(1), because they are associated with appellant's law practice as clients, relatives of clients, or employees. The offenses were committed "in the offender's same employment, or capacity, or relationship to another" under R.C. 2901.12(H)(2), again based on the centrality of appellant's law practice in his selection of victims. The offenses involved "the same or similar modus operandi" under R.C. 2901.12(H)(5), based on the grooming and exploitation of vulnerable female clients or relatives of clients. Finally, the offenses were committed in furtherance of the same purpose or objective (sexual gratification). R.C. 2901.12(H)(3).

{¶ 114} A similar case involving abuse of clients in a professional practice is persuasively on point. In *Ahmed*, the defendant, a licensed obstetrician and gynecologist, operated medical offices in several counties. The grand jury in Cuyahoga County returned an indictment charging him with multiple counts of rape, sexual imposition, and sexual battery involving 37 former patients. The indictment specified that the offenses occurred at Ahmed's offices in Cuyahoga, Summit, and Geauga counties. After disposing of the preliminary question of whether the grand jury could return an indictment addressing the out-of-county crimes, the Eighth District Court of Appeals found that trial venue in Cuyahoga County for all offenses was appropriate: "The evidence at trial revealed that all of the victims were Ahmed's patients, all of the offenses occurred at his medical offices while the victims were seeking medical care from him, and while situated in a vulnerable position. Further, each victim identified the office location where the offense(s) occurred. Based on this evidence, we find that the State adequately proved that venue was proper." *Ahmed* at ¶ 18.

{¶ 115} *Ahmed* presented the same type of course of criminal conduct that the state alleges here. Based on this precedent and analysis of the applicable statutes governing venue, we conclude that the state proved venue was proper in Franklin County for Counts 8, 10, 14, 15, 17, and 18 of the indictment.

{¶ 116}   Citing *Hampton*, appellant argues that because the indictment alleged the conduct associated with Counts 8, 10, 14, 15, 17, and 18 occurred in Franklin County, the state could only establish venue by proving that the alleged conduct occurred in Franklin County.  We do not read *Hampton* so restrictively.  *Hampton* involved a situation where all of the alleged criminal conduct occurred outside the county where the case was venued.  Therefore, R.C. 2901.12(H) was not applicable.  Moreover, the *Hampton* court noted that "[t]he General Assembly has given the state considerable flexibility with respect to establishing venue," citing R.C. 2901.12(G) as an example.  *Hampton* at ¶ 23.  *See also State v. Young*, 9th Dist. No. 15CA010803, 2017-Ohio-1400, ¶ 15-16 (finding no authority for proposition that an indictment must include "course of conduct" language when the state intends to proceed under R.C. 2901.12(H)).  Lastly, appellant was on notice that the state would establish venue by proving the conduct occurred in Franklin County "or otherwise properly venued under R.C. 2901.12, the defendant, as part of a criminal course of conduct as defined in R.C. 2901.12(H)(1), which encompassed at least, Franklin and Marion Counties, Ohio."  (June 1, 2014 Bill of Particulars at 6.)  As previously noted, the indictment alleged and the state proved, that some of the alleged criminal conduct occurred in Franklin County and that the other offenses in Counts 8, 10, 14, 15, 17, and 18 were committed pursuant to a course of criminal conduct as defined in R.C. 2901.12(H).

### 3. Conclusion

{¶ 117}   For all of these reasons, we overrule appellant's sixth assignment of error.

### F. Sufficiency of the Evidence

{¶ 118}   Appellant's seventh assignment of error asserts that there was insufficient evidence to convict him on Count 3, gross sexual imposition involving C.C., and Count 8, gross sexual imposition involving K.R.  Appellant argues that there was not sufficient force depicted during the victims' account of the incidents to establish violence, compulsion, or constraint "sufficient to compel" the victims to "submit" to the sexual contact.  R.C. 2901.01(A)(1) and 2907.05(A)(1).

### 1. Standard of Review

{¶ 119}   Again, an appellate court's function when reviewing the sufficiency of the evidence is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable

doubt. *Crosky* and *Jenks*, supra. Otherwise put, " '[s]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Thompkins*, *supra*, at 386, citing *Black's Law Dictionary* 1433 (6th Ed.1990). As a result, when we review the sufficiency of the evidence, we do not on appeal reweigh the credibility of the witnesses. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79.

### 2. Analysis

{¶ 120} The crime of gross sexual imposition, as charged here, involves sexual contact with another, not the spouse of the offender, compelled by force or threat of force. R.C. 2907.05(A)(1). The testimony presented by the victims was sufficient to establish the elements of the offense. C.C. testified that appellant firmly grabbed her with one arm and put his hands down her shirt and groped her breast. She was unable to move because appellant was holding her tightly. K.R. testified that, while in appellant's office, appellant closed the door, pulled her to the couch, and then touched her breasts without permission. Either description is sufficient to establish force necessary to prove gross sexual imposition. *See generally State v. Riggs*, 10th Dist. No. 04AP-1279, 2005-Ohio-5244; *State v. Birkman*, 86 Ohio App.3d 784, 788 (12th Dist.1983) (Physical force was established when the defendant backed the victim against the wall of an office and the defendant placed his arms in such a way that she could not move away from him.). Appellant's seventh assignment of error is overruled.

### G. Merger

{¶ 121} In his third assignment of error, appellant argues that the trial court erred by not merging certain convictions for purposes of sentencing. Specifically, appellant asserts that the court should have merged Count 10, rape, with Count 14, kidnapping. Appellant also asserts, and the state concedes, that the trial court merged the wrong sexual battery count with the rape count.

### 1. Legal Standards

{¶ 122} Ohio's multiple-counts statute provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). The statute further provides that "[w]here the

defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." R.C. 2941.25(B).

{¶ 123} When it is determined that the defendant has been found guilty of allied offenses of similar import, " 'the trial court must accept the state's choice among allied offenses, "merge the crimes *into a single conviction for sentencing*, and impose a sentence that is appropriate for the merged offense." ' " (Emphasis sic.) *State v. Bayer*, 10th Dist. No. 11AP-733, 2012-Ohio-5469, ¶ 21, quoting *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, ¶ 13. "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 28.

{¶ 124} *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, sets forth the standard to apply to merger determinations under R.C. 2941.25:

> 1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.
>
> 2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.
>
> 3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*Id.* at paragraphs one through three of the syllabus. *Ruff* provides that:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the

above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 31; *State v. Williams*, 7th Dist. No. 13 MA 125, 2015-Ohio-4100, ¶ 17.

{¶ 125}   Additionally, the Supreme Court of Ohio has acknowledged that "implicit within every forcible rape * * * is a kidnapping" because the victim's liberty is restrained during the act of forcible rape. *State v. Logan*, 60 Ohio St.2d 126, 130 (1979). In *Logan*, the court provided the following guidelines for determining whether kidnapping and another offense of the same or similar kind were committed with a separate animus:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions; (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Id.* at syllabus. Even though *Logan* predates *Ruff*, this court and others continue to apply the guidelines set forth in *Logan* in determining whether kidnapping and another offense were committed with a separate animus, in accordance with the third prong of the *Ruff* test. *State v. Jones*, 10th Dist. No. 15AP-670, 2017-Ohio-1168, ¶ 34; *State v. D.E.M.*, 10th Dist. No. 15AP-589, 2016-Ohio-5638, ¶ 143; *Williams*, 7th Dist. No. 13 MA 125, 2015-Ohio-4100, at ¶ 18; *State v. Stinnett*, 5th Dist. No. 15-CA-24, 2016-Ohio-2711, ¶ 53.

### 2.  Legal Analysis

{¶ 126}   As indicted, Count 10 alleged oral rape. R.C. 2907.02(A)(2) defines the crime of rape, and provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" is defined in R.C. 2907.01(A) as vaginal intercourse between a male and female, anal intercourse, fellatio, and cunnilingus.

{¶ 127}   Count 14 alleged kidnapping. R.C. 2905.01(A) defines the offense of kidnapping in part as follows: "No person, by force, threat, or deception, * * * shall remove

another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * (4) [t]o engage in sexual activity * * * against the victim's will."

{¶ 128}   L.M. testified that coerced fellatio occurred frequently over the time in question.  She described only one incident, however, in which appellant acted through force or threat of force:  the first incident of oral sex in appellant's Marion office.  As described earlier, L.M.'s trial testimony for this incident was that appellant threatened a poor result in her legal matters if she did not perform oral sex, placed his hands behind her head, thereby "restraining [her] head against his penis," told her to "do it," and forced his penis into her mouth.  (Tr. at 1483.)  Based on these facts and an application of the law set forth above, we conclude that the offenses were of similar import and were not committed separately or with a separate animus, and therefore, should have merged.  The record does not show that appellant's restraint of L.M. was prolonged or secretive, or that the restraint caused a separate and identifiable harm to L.M. or subjected her to a substantial increase in the risk of harm separate and apart from that involved in the rape offense.  Absent such evidence in the record, the trial court erred by not merging these two offenses pursuant to the *Ruff* analysis.

{¶ 129}   With respect to the merger of one of the sexual battery counts with the rape count, the trial court merged Count 15 with Count 10.  Count 15 was identified in the final bill of particulars as based on the facts surrounding one of the rapes involving transportation to an unidentified rural area in a white truck.  Count 17 was the sexual battery count based on the events identified with the Count 10 rape.  The state concedes error in this respect, and that instead of Count 15, it is Count 17 that must merge with Count 10.  We agree.

### 3. Conclusion

{¶ 130}   Based on the foregoing, we sustain appellant's third assignment of error.

### H.  Sex Offender Classification

{¶ 131}   Appellant's eighth assignment of error also asserts error in sentencing. Appellant contends that the trial court improperly classified him as a Tier III sex offender at sentencing.  (Tr. at 4063-64.)  He asserts that this violates Section 28, Article II of the

Ohio Constitution, prohibiting the application of retroactive laws, as discussed and applied in *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374.

{¶ 132} The General Assembly enacted H.B. No. 180, known as Megan's Law, in 1996. This created a comprehensive system of registration and classification for sex offenders. *See generally State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424. Megan's Law was significantly amended in 2003 by S.B. No. 5. Further changes came in 2007, when the legislature enacted S.B. No. 10, known as the Adam Walsh Act, creating additional reporting and registration requirements for sex offenders. *Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374 at ¶ 7. S.B. No. 10 also replaced Megan's Law's classification system and requirement for classification hearings with a new classification system that divides offenders into Tier I, Tier II, and Tier III offenders based solely on their offense. *Bodyke* at ¶ 20-21.

{¶ 133} Appellant's convictions included crimes through a period preceding and postdating enactment of S.B. No. 10. The state concedes that pursuant to the Supreme Court's holding in *Williams*, offenses prior to the effective date of S.B. No. 10 can support only a classification under the law in effect at the time of commission.

{¶ 134} As the verdicts stood at the time the court entered the sex offender classification, the convictions that would support a Tier III classification under S.B. No. 10 were Count 10, rape of L.M., and Counts 15, 16, 17, and 18, sexual battery of L.M. *See generally* R.C. 2950.01(G)(1), listing offenses supporting Tiers I through III. Although the date range of the indictment for these offenses extended to 2008 after amendment, L.M.'s testimony established that the last sexual assault by appellant occurred in 2003, well before the effective date of S.B. No. 10. Despite the state's assertion on appeal that the dates specified in the indictment should govern S.B. No. 10 applicability, the operative date must be the date of the conduct constituting the offense for which appellant was convicted. Appellant's eighth assignment of error is sustained and the trial court will vacate his Tier III classification on remand and classify appellant according to the law in effect at the time of the offenses for which he was convicted.

### I. Cumulative Error

{¶ 135} Appellant's ninth assignment of error asserts that cumulative error, as set forth in his first eight assignments of error, had the affect of depriving appellant of his

constitutional right to a fair trial, even if each of the particular incidences of error did not support reversal.  *See generally State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 32. "There can be no such thing as an error-free, perfect trial, and the constitution does not guarantee such a trial."  *United States v. Hasting*, 461 U.S. 499, 508-09 (1983). Summarizing our disposition of the allegations in this case, where we have not reversed conviction, we have found no additional error with the exception of the items discussed under the fourth assignment of error.  Viewing the totality of the events at trial, we find no cumulative basis on which to support further reversal of the remaining counts.  Appellant's ninth assignment of error is overruled.

## IV.  CONCLUSION

{¶ 136} In summary, appellant's first, second, fourth, fifth, sixth, seventh, and ninth assignments of error are overruled.  Appellant's third and eighth assignments of error are sustained.  The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and the matter is remanded for resentencing as to Counts 10, 14, 15, and 17.  The court will vacate appellant's Tier III sex offender classification and apply the sex offender classification under the law in effect at the time of the offenses for which he was convicted.

*Judgment affirmed in part; reversed in part;*
*cause remanded with instructions.*

SADLER, J., concurs.
TYACK, P.J., dissents.

TYACK, P.J., dissenting.

{¶ 137} The Ohio Constitution contains an Ohio Bill of Rights.  Article I, Section 10, provides:

> Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall

be determined by law. In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense.

{¶ 138} I draw attention to the right set forth in the Ohio Constitution that requires that an accused have a "speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed."  All judges, prosecutors, and legislators swear an oath to uphold the Ohio Constitution, including the provisions in Article I, Section 10, Ohio Constitution.

{¶ 139} The legislature has enacted R.C. 2901.12, Venue.  R.C. 2901.12(H) reads:

When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:

(1)  The offenses involved the same victim, or victims of the same type or from the same group.

(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.

(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.

(4) The offenses were committed in furtherance of the same conspiracy.

(5) The offenses involved the same or a similar modus operandi.

(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

{¶ 140} R.C. 2901.12(H) clearly conflicts with the requirement of Article I, Section 10, Ohio Constitution that an offense be tried in the county in which it is alleged to have been committed. A statute does not undo a provision of the Ohio Constitution and does not take precedence over it. However, Article I, Section 10, Ohio Constitution clearly places an inconvenient burden on prosecuting attorneys and assistant prosecuting attorneys. In Armengau's case, Article I, Section 10 means that there should have been two trials, one in Marion County, Ohio and one in Franklin County. The majority opinion goes to some length to explain why the Ohio Constitution did not need to be followed. I would uphold the Ohio Constitution.

{¶ 141} My second concern about the proceedings against Armengau is the fact that a great deal of prejudicial evidence was placed before the jury and then the prosecution was permitted to argue that even though some of the evidence was utterly incredible, there was so much of it that Armengau must be guilty of something.

{¶ 142} A third concern is related. The prosecution presented evidence which indicated that part of what Armengau did was immoral, as opposed to being illegal or proof of a crime. Criminal trials in Ohio are supposed to be proceedings which fairly determine if a person has violated a provision of the Ohio Revised Code. Criminal trials should not become a game in which the prosecution or defense is trying to "win." Viewing trials as a game risks having one side or the other trying to insert allegations which have nothing to do with the guilt or innocence of the crime charged in the indictment. For instance, having consensual sexual contact with another is not a crime in Ohio and is not proof of a crime.

{¶ 143} I believe the second assignment of error should be sustained and the charges against Armengau be tried again in a truly fair proceeding.

{¶ 144} If the second assignment of error were sustained, the other assignments of error become moot.  Since I would sustain the second assignment of error, I dissent from all of the majority opinion except part of the analysis of the so-called merger issue, R.C. 2941.25.

———————————